NELSON, Respondent, v. HIRSCH & SONS IRON AND RAIL COMPANY, Appellant.

St. Louis Court of Appeals, November 17, 1903.

1. **Practice: PARTIES: TRUSTEE OF AN EXPRESS TRUST.** Where the plaintiff had made a contract with defendant for the benefit of himself and those associated with him in the purchase of certain franchises, he is the trustee of an express trust, as defined by section 541, Revised Statutes 1899, and may sue on such contract in his own name.

2. **Contract of Sale: DESCRIPTION OF THING SOLD.** A contract for the sale of all the girder and T rails to be taken up by plaintiff in the reconstruction of certain street railroads, where the testimony shows that defendant knew as much about them as plaintiff did, is not void for want of a definite description of the thing sold.

3. ——: ——. Where the offer and acceptance of a sale of rails is by telegram and fails to mention the time of delivery, but preceding correspondence shows that plaintiff was willing to deliver in from forty to sixty days and defendant was willing to receive in thirty, sixty or ninety days, the offer and acceptance constitute a contract, notwithstanding the failure to mention the time of delivery.

4. **Practice: ERROR NOT REVERSIBLE.** It is the province of the court to determine from a writing or writings, whether a contract.

existed or not, and to instruct the jury accordingly, but it is not reversible error to submit the question of the existence or non-existence of a contract to the jury, where the jury find what the court should have found for them.

5. **Contract: REPUDIATION OF.** Where plaintiff contracted to deliver rails for relaying, and defendant afterwards claimed that the relayers were to be "first class," but plaintiff promptly informed defendant that he had no first class relayers, and requested an inspection by defendant, this did not amount to a repudiation of the contract by plaintiff.

6. **Sales: RESALE BY VENDOR -ON FAILURE BY VENDEE: MEASURE OF DAMAGES.** Upon a breach of a contract of sale by the vendee, the vendor may, within a reasonable time, resell the property and recover the difference between the contract price and the net amount realized from it upon the resale, provided he give notice of the resale to the vendee.

7. ———: ———: ———. Where, upon a breach of the contract by the vendee, the vendor does not give notice of resale, the measure of damages will be the difference between the contract price and the market value of the property at the time and place agreed upon for its delivery.

8. ———: BREACH OF CONTRACT BY VENDEE: DELAY IN DELIVERY NO DEFENSE WHEN. Where the plaintiff did not deliver all the goods contracted for within the contract period, but the delay was in part caused by a letter of defendant not to ship, by its demand for a quality of goods not stipulated for in the contract, and its disinclination to inspect the goods, plaintiff may recover damages for breach on part of defendant, notwithstanding the delay in delivery.

9. **Damages: INTEREST ON FOR BREACH OF WRITTEN CONTRACT.** In an action for breach of a written contract for the sale of goods at a certain price per ton, the number of tons delivered was uncertain at the time of the breach, and after it was ascertained defendant was not notified, and no demand was made for payment of damages to the seller on a resale: *Held*, interest could be recovered on the damages sustained under section 3705 of Revised Statutes of 1899, but only from the commencement of the suit.

## Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher*, Judge.

AFFIRMED.

*A. L. Hirsch* and *Judson & Green* for appellant.

(1)   Respondent can not maintain this action, because in his testimony he admitted that he was not the real party in interest, and that he with others had transferred or assigned the cause of action before the suit was filed, and this fact was pleaded by appellant as a defense to the action; therefore, the court erred in refusing appellant's instructions that respondent was not entitled to recover under the evidence adduced.   R. S. 1899, secs. 540 and 541; Guerney v. Moore, 131 Mo. 668; Buffington v. Land Co., 25 Mo. App. 492; Brady v. Chandler, 31 Mo. 28; Little v. Harrington, 71 Mo. 390.   (2) But said correspondence of date prior to February 10, 1900, is not sufficient to constitute a valid and enforcible contract, in that it is too indefinite and uncertain as to the quantity of each kind of rails, and as to the time of the delivery thereof to appellant. Bishop on Contracts (1887 Ed.), secs. 316 and 324; Eads v. Carondelet, 42 Mo. 113. (a)   The appellant inquired if the said rails would be sold for delivery in "30, 40 or 60 days," and respondent replied that he would sell for "future delivery."   This is too vague and indefinite to constitute a contract.   (b) Time is the essence of such contracts.   Denton v. McInnis, 85 Mo. App. 556, and cases cited.   (c)   And purchaser can repudiate any time after time limit has expired.   Redlands Orange Grower's Ass'n v. Gorman, 161 Mo. 203, and cases cited.   (3) Written correspondence which, it is claimed, constitutes a contract, should be interpreted by the court, first, as to whether or not there is a contract; and, secondly, if there is a contract, as to what it means—that is, what the parties thereto have respectively undertaken to do; and if there was a contract in this case, the trial court erred in submitting these questions to the jury by its instructions.   Ford v. Dyer, 148 Mo. 541; Enterprise Soap Co. v. Sayers, 55 Mo. App. 16; Bronson v. Turner, 77 Mo. 489. The question of a rescission of this contract was also for the

court.   Ford v. Dyer, 148 Mo. 541; Enterprise Soap Co. v. Sayers, 55 Mo. App. 16.

*J. L. Hornsby* for respondent.

(1)   Plaintiff had the right to bring suit in his own name, the contract with defendant having been made by him, in his own name for the benefit of his co-owners and himself.   He is a trustee as defined in the statute.   R. S. 1899, secs. 540-541; Snider v. Express Co., 77 Mo. 523; Harrigan v. Welch, 49 Mo. App. 496; Hooney v. Dutcher, 15 Mo. 89; Beattie v. Lett, 28 Mo. 596; Wright v. Tinsley, 30 Mo. 389.   (2)   The correspondence between plaintiff and defendant in evidence, constituted a valid and binding contract, and if the court saw fit to submit the question to the jury to determine whether or not a contract existed, respondent alone is prejudiced and appellant has no cause of complaint. Blashfield on Instructions to Juries, secs. 389, 390; Holmes v. Braidwood, 82 Mo. 610; Soldanels v. Railway, 23 Mo. App. 516; Railroad v. Vivian, 33 Mo. App. 583.   (3)   Plaintiff acted properly in making sale of the rails refused by defendant, as he did, selling the same within a reasonable time after defendant's refusal to accept, at the best price obtainable.   Whether the resale was made within a reasonable time after defendant's default was a question for the jury.   Logan v. Carrol, 72 Mo. App. 613; Strauss v. Labsap, 59 Mo. App. 260; Ingraham v. Mattheim, 3 Mo. 209; Van Horn v. Rucker, 33 Mo. 391; Lumber Co. v. Warner, 93 Mo. 374; 24 Am. and Eng. Ency. of Law (2 Ed.), p. 1142. (4)   Plaintiff's statement that he would refuse to ship the relaying rails until they had been inspected by defendant not being a distinct, unequivocal, absolute refusal to perform the contract, and the same not having been acted upon as such refusal by defendant, who afterwards continued to urge and demand compliance with the contract, showing plaintiff that defendant did not

consider the contract at an end, constitutes no breach or renunciation of the contract.  Benjamin on Sales (6 Ed.), sec. 568; Beach on Contracts, sec. 413; Dingley v. Oler, 117 U. S. 503; Smoot's Case, 15 Wallace 49; Johnstone v. Milling Co., L. R. 16, Q. B. D. 467.  The amount of the verdict is reasonable and fair.

### STATEMENT.

On January 22, 1900, plaintiff wrote defendant from Wichita, Kansas, as follows:

"Dear Sir:   We shall have for sale within thirty or forty days several carloads of 35-lb. T. rails and 45-lb. girder rails.   Both will be suitable for relaying.   What can you offer f. o. b. cars here?"

From the date of this letter up to and including February 9th, a regular and frequent correspondence in respect to the rails mentioned in plaintiff's letter of January 22, was kept up.   On February 9th, in answer to a direct inquiry for prices, plaintiff wired defendant as follows:

"Scrap twelve fifty, girder fifteen, relayers twenty, gross ton, Wichita."

On the same date plaintiff wrote defendant as follows:

"Dear Sirs:   Have wired you as follows:  'Scrap $12.50, girder $15, relayers $20, gross ton, Wichita.' If accepted, we will, if you desire, commence loading as soon as our new material is on the ground and we can commence the work of reconstruction."

On the same date defendant telegraphed plaintiff as follows:

"S. L. Nelson, Gen. Mgr. & Pur. Agt., Springfield, O.:   Telegram received.   We accept scrap, girder rails and thirty-five pound relaying tee rails your price."

This telegram was followed by a letter from defendant to plaintiff accepting the plaintiff's offer f. o. b. Wichita, with the request that plaintiff let defendant

know when he would ship same, and indicating defendant's desire to give shipping directions before any of the material should be loaded, and also requesting that plaintiff give defendant an idea as to how many hundred tons of girder and 35-lb. relaying rails there would be. Again on February 12th, defendant wrote plaintiff inquiring the number of tons of 35-lb. relayers plaintiff would have to ship and giving directions to ship by the Rock Island and to consign mixed scraps to Cal Hirsch & Sons Iron and Rail Company, V. & C. Belt, East St. Louis, Illinois, and saying: "It would favor us if you would ship the relaying T. rails with splices at once—two to four carloads or more."

A carload of scrap was shipped by plaintiff to defendant, which was received by it and paid for.

On February 16th, and also on the 20th, defendant wrote plaintiff to hurry up shipments of relayers, and again on the 22d wrote plaintiff: "We will thank you indeed to let us know when you are ready to ship the 35-lb. *first-class* relaying T. rails with fastenings, and how many carloads or tons there will be. Also let us know when, you are going to ship the other material."

On February 23 plaintiff wrote defendant as follows:

"Gentlemen: We are just in receipt of your favor of the 22d. The beginning of our work is delayed on account of a few minor materials which have failed to arrive. We are advised, however, that on to-morrow or Monday shipment of all these things will be made. This ought to mean that with favorable weather our work should begin vigorously next .week. If so it is barely possible that we can give you one car of relayers on March 15th or 20th. We doubt whether there will be more than one car available for some time. These relayers will not be as you state, 'first-class relaying rails,' and will not include the fastenings. We have found upon investigation that nearly one-half of the splices are broken and our new joints will require the

use of one of the old bars so we do not believe that you can count upon receiving any at all. We doubt very much whether these relaying rails will be suitable for any other than logging tramways.

"We shall have in perhaps sixty days about one hundred tons of 35-lb. T. iron rails. These of course you understand will be worth more as scrap than as relayers. What will you offer us for them? We will respect your instructions with regard to routing and will advise you a day or two in advance of any further shipments. When Mr. Cohn returns will be glad to have him go with us and look at the relayers. He perhaps can report to you more satisfactorily than we can."

Defendant answered this letter as follows:

"Dear Sir: We have your letter of the 23d, contents noted for which accept our thanks; but, Mr. Nelson, as we purchased fifty tons or more of good, first-class relaying rails from you and we sold them, you therefore see our position, and as for the iron tee rails, you will find that they are not worth as much for scrap as for relayers, as old iron tee rails have declined very much, nevertheless, we would like to get the fifty (50) tons of good, first-class relaying rails according to purchase and would ask you to let us know when you will be able to ship them to us. We also wish to call your attention to the fact that you wrote in your original letters when you offered us this material that you did not know whether you would sell iron or steel relaying tee rails and we understood that we bought all of the 35-lb. relaying rails which you had, all in first-class relaying condition as the sale and purchased of you according to your letters and our letters as well as telegrams, and we thank you to let us hear from you. Doubtless you have some of the fastenings which will be all right for these rails. Of course, we do not expect more of these than you can scrape up for us, but will appreciate to get as many as possible of these fastenings that are first-class. Thanking you in advance for your kind attention and

feeling assured that you desire to do the proper thing and awaiting your prompt answer fully, we are,'' etc.

To this letter plaintiff replied:

''Gentlemen: Your esteemed favor of the 26th just received. I am unable to find a copy of my original letter to you concerning scrap and relayers, and am under the impression that they are on my file in Springfield. There was absolutely no intention on our part to misrepresent what we had for sale. The information which we sent out was obtained from the old management of the property. In starting our track work a few days ago uncovering the rails, it developed that the base was badly rusted and decayed and a great many of them (rails) are considerably bent. It may be that these same conditions may not prevail in all parts of the town, but we will not know until we have made discovery in the same manner as in this instance. I wish you would send us an exact copy of our letter to you as the writer will not return to Ohio for ten days or two weeks. We think that you must have misunderstood us in reference to the iron rail as it has not been our intention at any time to replace that rail until practically all of our other work has been completed. We regret exceedingly that there has been any misunderstanding or that we have apparently offered something for sale which we can not deliver. With reference to the fastenings, we will advise you after we have taken up a considerable portion of the track and find the exact condition they are in, but we are quite sure that we will not have any fastenings to ship for the reason there is perhaps a mile and a half of track without any joints at the present time.''

On March 3d, defendant wrote plaintiff as follows:

''Dear Sir: We have yours of the 28th ult. and we herewith enclose you a copy of your letter to us and hope indeed that you will let us hear from you at once how many tons there will be of first-class relaying 35-lb.

rails, iron or steel, on account of our having disposed of same, and of course we expect to get all you have got. Please let us know how many tons there will be of first-class relaying 35-lb. rails, iron and steel and about when you think you will be able to ship them all.    Please answer at once."

On the thirtieth of March, defendant directed plaintiff to ship all material by the Rock Island railroad and requested plaintiff to let it know when he would have relayers ready to ship.

On April 2, 1900, plaintiff drew a draft on defendant for $572, the proceeds of two cars of girder rails shipped on that date.

On April 4th, defendant wrote plaintiff as follows:

"Dear Sir:   We have yours of the 1st, contents carefully noted.   Regarding the 35-lb. rail we have, in order to make this matter satisfactory, and as you intend to use some of the rails, and as you state, you will naturally retain the best, then the only just thing you can do is to put the tee rails in at the same price as the girder rails, and then will not demand the relaying rails you have sold us, and will stand the loss by supplying relaying rails from another source, which will entail a loss. Will you kindly answer, stating that this is satisfactory and that you will ship all the tee rails you have at the same price as the girder rails.  Please answer at once as the market is very weak and as prices have gone down considerably and still going lower, so do not fail to answer at once and oblige," etc.

On April 6th, plaintiff wrote the defendant declining its proposition to let it have T. rails at the price of girder rails and calling defendant's attention to plaintiff's letter of January 28th, in which it was asked to note that plaintiff had said in that letter "and perhaps fifty tons of 35-lb. T. rails," and said:  "While we believed that they were fairly good relayers, we had no knowledge that they were and did not so state.   If you will inspect these rails they may perhaps be as good as

you desire, but we will not dispose of them except in accordance with our previous arrangement.''

In answer to this letter, defendant, on April 9th, wrote plaintiff calling his attention to some previous correspondence insisting that he should let hem have the T. rails on the agreed price of the girder rails, but said nothing about inspecting the rails before shipment. On April 20th, defendant telegraphed plaintiff not to ship any material as it was too crowded to receive it, and added: ''When will you be ready to ship the 35-lb. T. rails and how many tons will there be to ship to us?'' To this telegram plaintiff replied as follows:

''Gentlemen: Your favor of the 20th, asking us not to ship any more material at present, received. Too late, however, as several days ago we placed an order for cars and yesterday loaded them. Same have gone forward. We will not make further shipments until we hear from you. We expect next week to complete all of our track work in the pavements, replacing the girder rail and will immediately thereafter commence work on our 35-lb. T. As previously stated, however, we shall hesitate to make shipments of any of this T. unless same has been inspected by you. It may be that the rail on other lines will make a better showing than those already taken up, in which case we will be very glad to ship them. I should say, however, that by May 1st or 20th would be as early as we can possibly ship them. Yours truly, S. L. Nelson. PS. We have one car rail at our powerhouse (girders) which we would like to get out of the way. They are on Missouri Pacific track. Can you use them in week or ten days?''

Plaintiff, on the 24th, notified defendant that he had about three more carloads of girder rails he would like to ship. On the same day defendant wrote plaintiff as follows:

''Dear Sir: As we wrote you please do not ship us any more material as we can not receive it, and if you have any cars on the track, kindly leave them set there

and have them unloaded again as we have not possibly any room, nor can we receive same as written you; besides we desire to know about the 35-lb. relaying rails we purchased of you first, whether you intend to put these in at the same price as the girder if not being first-class relaying as we bought of you, by your own statement, and secondly, you not being able to furnish us what we purchased of you — 35-lb. relaying tee rails. We asked you this question before and have had no definite response. Of course if you can not comply with our contract originally made to furnish us 35-lb. relaying tee rails, as well as the other material, the whole contract is cancelled, which doubtless you appreciate is expected and quite justifiable. We wired you through the R. I. agent to-day not to ship any more cars as we can not receive them. Therefore, please do not do so and unless you can fill contract as originally bought— give us relaying tee rails as purchased—then cancel the contract entirely, which of course you understand is to be expected and quite the proper thing. Yours truly, Cal Hirsch & Sons Iron & Rail Co., I. C. Hirsch, V-P & T. PS. We have accordingly cancelled contract since you can not fill it as per original contract.''

On April 24th, plaintiff shipped defendant five carloads of girder rails which defendant refused to receive. In regard to this shipment plaintiff wrote defendant as follows:

''Gentlemen: We wired you last night as follows: 'Bank advises you refuse payment our draft. Why? Answer quick.' We have this morning received your reply as follows: 'Our letter to you 20th also 24th explained exactly, also telegram 18th to R. I. agent at Wichita, not to ship.' As advised in our letter of the 22d, the five cars were loaded before your request to not ship them was received. The agent of the R. I. says he received no instructions from you not to ship. These cars have gone forward in strict accordance with our contract and we insist on a strict and full compliance

with same.   Unless we hear from you by telegraph to-morrow morning, April 27th, stating that you have paid our draft for $1,297.76, we shall take the train for St. Louis with the intention of demanding from you a settle-ment.   On failure to respond promptly and to carry out other terms and conditions of contract, we will at once enter suit against you for any and all damages and ex-penses in which we may be involved.   It is not our prac-tice to make a contract and then simply because the mar-ket declines to permit the contractor to cancel same at will.   We are prepared to fully comply with the condi-tions of our contract and we shall insist that you do the same.   Bear in mind that if the writer is obliged to go to St. Louis that it will be at your expense.''

Defendant answered this letter calling attention to its former instructions not to ship and to plaintiff's in-ability to fill his contract to furnish T. rails, and on the 26th again wrote as follows:

''Dear Sir:  We have yours of the 24th enclosing five bills of lading which we herewith return to you, as doubtless the cars have never left Wichita, and as we can not receive same, as explained to you, in so much as you have violated your contract, by not giving us what you sold us in the way of relaying rails which naturally cancelled our entire contract with you, as ex-plained.    Therefore, we could not give you shipping in-structions for three more cars, but would like very much to have you notify us when you have anything to offer for sale, and we will pay you all it is worth, but here-after, please be positive as regards what you sell us. I gave you an opportunity to rectify matters, which you declined and refused, that is to put in 35-lb. tee rails at the same price as the girders, and therefore our con-tract with you is off entirely, as explained.   Kindly acknowledge receipt of these bills of lading and oblige,'' etc.

On the 27th plaintiff wrote defendant notifying it that he would sell the stuff (the five carloads) at the

best price obtainable and charge it up with the loss, if any, and on the 28th notified it that he had sold the five carloads of girder rails at twelve dollars per ton and charged its account with the difference between what he had sold them for and the contract price ($259.55) and calling upon it to pay the loss. Defendant notified plaintiff that it declined to pay this loss or to receive any more material for the reason, as charged by it, that plaintiff had been unable to furnish the 35-lb. T. rails sold by him to it.

Plaintiff testified that the market was down at the time defendant refused to receive the five carloads of girder rails and that he sold the rails at twelve dollars per gross ton, being the best price he could get for them at the time, and that the loss was $259.55; that for some time after this he hoped defendant would yet take the rails and for this reason he did not make an immediate effort to put them on the market, but made inquiry to find out the market price of the material and eventually sold it all at the best price obtainable; that prices had gone down very materially and he gave in detail the sales he had made, the dates, the persons or corporations to whom sold and the price of each sale; that the first sale was made on June 18th, the last on November 19, 1900, and that he obtained the very best prices that he could; that the sales were all made at private sale and for the market value of the rails at the time.

He further testified that a first-class relaying rail was worth, on the market, as much as a new one; that what was understood in the trade by relayers, were rails used around mills, saw works, brickyards and things of that kind and need not be first-class; that he sold between fifty-seven and fifty-eight tons of relayers.

The defendant offered evidence tending to show that by relaying rails was meant rails that were safe for either steam or street railroads and that plaintiff sold the material at less than its market value, but that the material was worth less on the market in April,

May, June and July than earlier in the season; that the market was on the decline from early in the spring of 1900 until sometime in the fall.

The verdict and judgment were for plaintiff for $1,450. Defendant's motion for new trial proving of no avail, it appealed.

BLAND, P. J. (after stating the facts as above).— 1. Defendant contends that by plaintiff's own evidence it is shown that he was not the real party in interest and that this fact having been alleged in the answer, the trial court should have sustained defendant's instruction in the nature of a demurrer to the evidence.

The evidence of plaintiff shows that two franchises were obtained in Wichita by purchase, one a street railroad, purchased by a Mr. Woodman, the other an electric light franchise, purchased by a Mr. McKinney, but that the conveyance of both franchises was to the plaintiff and remained in his name until the parties in interest incorporated, which occurred in April, 1900; that after the incorporation he transferred the property to the corporation; that when the franchises were acquired, Woodman, McKinney, himself and several others were interested in their purchase and the purchases were made with a view of incorporation and with the intention that when incorporated he should transfer the property to the corporation; that the street railroad franchise acquired took in the street railways of Wichita, that they had to be reconstructed and their reconstruction was placed in his charge and was done under his supervision in his individual name, both before and after the corporation was formed; that he received all the moneys which the old rails and materials brought, and paid all the bills in the reconstruction by his individual checks, except about $40,000 paid out for new rails which was paid by the corporation's eastern office.

By section 541, Revised Statutes 1899, a trustee

of an express trust is authorized to sue in his own name. This section declares: "A trustee of an express trust, within the meaning of this section, shall be construed to include a person with whom or in whose name a contract is made for the benefit of another." According to plaintiff's evidence, and there is none in the record to contradict him, the contract was made with defendant for the benefit of himself and his associates in the purchase of the Wichita franchises. As to these (his associates) he was clearly the trustee of an express trust, as defined by section 541, supra, and authorized to prosecute this suit in his own name. Snider v. Adams Express Co., 77 Mo. 523; Sawyer v. Railway, 156 Mo. l. c. 475; Springfield to use v. Weaver, 137 Mo. l. c. 671; Ellis v. Harrison, 104 Mo. 277; Chouteau v. Boughton, 100 Mo. l. c. 411; Gunnell v. Emerson, 73 Mo. App. 291; Harrigan v. Welch, 49 Mo. App. 496.

2.    Defendant insists that for the reason the exact number of gross tons was not mentioned in the correspondence between plaintiff and defendant, there was no contract.    The contract is definite and certain in respect to the material contracted for and the price to be paid for the two grades of rails.    The quantity of each grade was estimated or guessed at.    The rails were laid in the streets of Wichita and plaintiff testified that the defendant knew as much about them as he did, when the contract was made.    The correspondence shows that defendant knew the rails had to be taken up before they could be shipped and that it accepted the plaintiff's offer of an indefinite and somewhat uncertain number of tons of rails.    The thing sold was agreed upon, to-wit, all the girder and T. rails to be taken up by plaintiff in the reconstruction of the street railroad in Wichita. This was a sufficient identification of the thing sold, besides the uncontradicted evidence is that the defendant accepted and paid for the scrap iron brought into the contract by the correspondence and it ought not be allowed to accept a portion of goods that proved profitable

to it and refuse the remaining goods that were probably not profitable. It can not accept the beneficial portion of the contract and repudiate the balance, though it would cause it a loss.

3. It is further contended by defendant that the time for delivery is so indefinite as to invalidate the contract and that no time of delivery at all is mentioned in the contract. If nothing but plaintiff's telegram offering prices and defendant's acceptance is looked to for the terms of the contract, then there was no time whatever agreed upon for the delivery of the material. But the offer and acceptance must be interpreted by the preceding correspondence. Plaintiff had represented that he would be ready to deliver in carload lots at Wichita in from forty to sixty days. The defendant expressed its willingness to receive the rails in thirty, sixty or ninety days and the parties must be presumed to have had this correspondence in mind when the subsequent offer was made and accepted, and the contract, as to time of performance, be construed a contract to deliver in thirty, sixty or ninety days.

4. The court submitted to the jury for them to find whether or not there was a contract made. Defendant contends that this was error. When a party relies upon a writing or a number of writings, to establish a contract, it is unquestionably the province of the court to determine from the writing or writings whether or not a contract was entered into and to instruct the jury not only as to its existence or non-existence, but also, if it finds there was a contract, to instruct the jury what it is and what the respective parties agreed to. But it is not reversible error to submit the question of the existence or non-existence of a contract made up by a writing or number of writings, if the jury, as was done in this case, find what the court should have found for them, to-wit, that there was a contract.

5. It is also contended by defendant that plain-

tiff's letters of March 28th and April 1st, stating that he would hesitate to ship any more rails unless defendant would inspect them or have them inspected, amounted to a repudiation or cancellation of the contract. These letters were induced by a previous one of defendant, in which it claimed *first-class* T. rails. The contract did not call for *first-class* relayers and plaintiff promptly informed the defendant that he had no first-class relayers for sale, and we think was justified in hesitating to ship without inspection. His letters certainly nowhere indicate a purpose on his part to repudiate the contract. He did not demand an inspection as a right under the contract, but asked it as a favor for his own protection and for the satisfaction of the defendant.

6. Defendant insists that in no event has plaintiff any right to recover more than $259.50, the loss of the five carloads of rails shipped April 24th, which defendant refused to receive or pay for. Defendant notified plaintiff by letter of April 24th, that it cancelled the contract. This letter was probably received on April 26th, and plaintiff testified that he still hoped the defendant would take the rails, and made no immediate effort to sell any of them, and made no sales until June 18th. The contention is that he delayed for an unreasonable time to resell the rails and that he resold without notice to defendant.

The evidence of plaintiff shows that as soon as he became convinced that defendant would not take any more of the material, he at once made inquiry in regard to its market value; that the price was unsatisfactory and for this reason he made no sales until June 18th, when the price had become somewhat better.

He further testified that he did not want to sacrifice the material, but endeavored to protect both himself and defendant and held off the sales for this purpose, and when he did sell he obtained the full market value of the material. It is the law that upon a breach of a contract of sale by the vendee, the vendor may at once, or within

a reasonable time, resell the property and recover the difference between the contract price and the net amount realized upon the resale, provided he give notice of the resale to the vendee. Rickey v. Tenbroeck, 63 Mo. l. c. 567, and cases cited; Logan v. Carroll, 72 Mo. App. 613. But if the vendor does not give notice to the vendee of the resale, the latter is not precluded thereby and the measure of the vendor's damages will be the difference between the price agreed upon and the market value of the goods at the time and place agreed upon for their delivery, although they may have brought less than their market value at the resale. Black River Lumber Co. v. Warner, 93 Mo. 374; 2 Mechem on Sales, sec. 168; 2 Sedgwick on Damages (8 Ed.), sec. 555. We think the evidence tends to show, that under the circumstances plaintiff did resell within a reasonable time and that he obtained the market value of the material when he did resell, and realized more than he would have realized had he made the sale immediately after defendant repudiated the contract.

7. Defendant contends that plaintiff did not offer to deliver all the rails within the contract period. The evidence tends to prove that such was the case, but it is also in evidence that the delay was occasioned, in part at least, by the letter of defendant not to ship, by its demand for a quality of relayers not stipulated for in the contract, and its disinclination or refusal to inspect the rails, as requested by plaintiff, before shipment should be made, and we conclude that the plaintiff is not estopped by his failure to deliver the material within the contract period to recover damages for the loss he has sustained by reason of the breach of the contract on the part of defendant.

8. It is finally contended that the verdict is excessive. The trial court by its instructions to the jury, properly limited the damages to the loss on two hundred tons of girder rails and fifty-five and forty-eight hundredths tons of 35-lb. relaying T. rails. The plain-

tiff's evidence shows that the losses sustained by him are. as follows:

On 5 cars of girder rails shipped to St. Louis. .$259.50
On the sale of 5 tons of T. rails.............. 16.00
On the sale of 31.85 tons of T. rails.......... 222.95
On the sale of 110 tons of mixed rails........ 440.00
On the sale of 20 tons of girder rails......... 160.00
_____

Making a total loss of................. J$1,098.45

That he gained over the contract price, $19.20 on a sale of eight tons of T. rails, and $25.80 on a sale of ten and one-half tons of T. rails, making a gain of $45 over and above the contract price on the sale of eighteen and one-half tons of T. rails, leaving a net loss of $1,053.45, to this amount the court instructed that interest at six per cent for one year, nine months and three days should be added; with this interest to the principal, the recovery should have been for $1,164.05. '

It is contended by appellant that this was error. There was no fixed sum agreed upon to be paid. This amount had to be ascertained by the number of tons of relaying and girder rails the plaintiff would have for delivery after taking them up. The market price of the rails had declined at the time defendant breached the contract and it was reasonably certain that the breach would occasion damage to plaintiff, but the amount of the damage was uncertain, not agreed upon, but the elements by which to ascertain the damages were not wholly at large, as in actions *ex delicto*. However, the defendant had no means of ascertaining, nor could it be ascertained, what the damages would be until the number of tons of each grade of rails had been ascertained; after this was done, no notice of the fact was given to the defendant, nor was any demand made upon it for payment of the difference between the contract price and the market value at the time of the breach, and the court properly restricted the computation of interest to

the commencement of the suit.    But it is contended by the appellant that no interest at all should have been allowed, and cites the case of Wiggins Ferry Co. v. Railway, 128 Mo. 224, as supporting this contention. The action in that case, as in this, was for breach of contract, but the damages were for loss of profits the plaintiff would have made in its ferry business had the defendant lived up to its contract.    The damages sustained in the case in hand are the difference between the contract price of goods sold and the market value of the same goods at the time defendant refused to receive them under its contract.    These damages accrued under a written contract and the plaintiff was entitled to interest thereon under the express provisions of section 3705, Revised Statutes 1899.    But in the present case, the damages assessed by the jury are $285.95 in excess of the amount of loss with interest, as shown by plaintiff's evidence.    It is therefore considered by the court that unless the plaintiff, within ten days from the date of the filing of this opinion, remit $285.95 from his judgment, the same will be reversed and the cause remanded for new trial; but if the remittitur be entered within the time herein allowed, the judgment for $1,164.05 will stand affirmed.    *Reyburn* and *Goode, JJ.,* concur.