# MORAN BOLT & NUT MANUFACTURING COMPANY v. ST. LOUIS CAR COMPANY, Appellant.

### Division One, April 1, 1908.

1. **CONTRACT: Reformation: Preponderance of Testimony.** In an equitable proceeding to reform a written contract on the ground of mistake, the burden of proof rests upon the party who asserts the mistake, and he must establish it by clear and convincing evidence, or the relief will be denied. In the absence of a preponderance of the evidence in his favor, however clear and positive this may be, the contract must stand as written. And where defendant's purchasing agent, who made the contract for defendant, refused to state positively that the contract did not state the true intention of the parties thereto, but contented himself with testifying that he believed that the contract was to the effect that defendant was to take all or such part of the one thousand tons of iron as defendant might need, whereas the contract itself unequivocally obligated defendant to take that number of tons, and plaintiff's testimony is unequivocal that the contract as written expressed the true terms of the agreement entered into, the contract cannot be reformed to comply with the testimony of defendant's purchasing agent.

2. **SALES: Contract: Breach: Mutuality.** A contract for the sale of bars of iron in which the quantity sold is stated therein, or from which the quantity may be made certain from the words used, is not void for lack of mutuality or uncertainty.

3. ———: ———: ———: ———: **This Contract.** A letter addressed to plaintiff by defendant read: "Enter our order for 1,000 net tons of bar iron at $1.70 per 100 lbs., F. O. B., our works, half card extra. · No charge for cutting to length 5 feet or over. Specifications to be furnished during balance of the year. Terms 30 days net from date of arrival of material." This order was accepted, and about five hundred tons shipped thereunder, and thereafter defendant refused, though often requested within the year, to specify out any more bars, or to otherwise comply with the order. *Held*, that the contract was not void for lack of mutuality, or as being unilateral or for uncertainty as to the amount of iron bars to be shipped, for the quantity is not only stated, but the evidence shows that the words "bar iron" in the contract have reference to a certain base size, and the words "half card extra" to list prices stated on a card for bar iron above the base size.

4. ———: ———: **Technical Words: As Interpreted by Parties.** Oral evidence is admissible to prove the meaning of words used in a written contract where they have a special or technical meaning in the connection in which they are used, and where it is shown all the parties were familiar with them and with the sense in which they were employed. And where both put the same meaning upon them, in the giving and filling of orders thereunder, the contract is not void for uncertainty or indefiniteness or for lack of mutuality.

5. ———: ———: **Breach: Refusal to Accept Goods.** A refusal by a purchaser to specify out goods according to the written contract therefor and to accept such goods, constitutes a breach of the contract, and the seller is entitled to recover the consequential damages that flow from such breach.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor*, Judge.

AFFIRMED.

*W. E. Fisse* for appellant.

(1) Under the evidence the finding and judgment upon the cross-bill should have been in favor of defendant. (2) The first and third instructions given

by the court at the instance of the plaintiff are erroneous. (a) Both instructions are based upon the theory that the agreement in question amounted to a sale of certain and existing articles of merchandise, whereas the agreement was, in fact, for uncertain and unspecified merchandise, to be manufactured in the future. (b) The rule of damages set out and directed in the third count to be applied was erroneous. Since the agreement contemplated the future manufacture of the goods, the measure of damages, at most, was simply the difference between the contract price of the manufactured articles at the place of delivery and the cost of manufacturing and delivering at that point. As plaintiff furnished no evidence of the amount of this difference it was not entitled to recover substantial damages. (3) The contract was wholly unilateral and became obligatory upon defendant only to the extent that its separate definite orders were accepted and complied with by plaintiff. (4) The subject-matter of the contract was so vague and indefinite as to render the entire contract void except as, by action of the parties, it became definite and was fulfilled. Every action, however, taken towards rendering the general contract certain was merely the conclusion of new and separate agreements for specific quantities of ascertained merchandise. Hence, the fulfillment of specific orders, given by defendant, was not a performance of any general contract, but merely the fulfillment of separate and independent specific agreements. (5) The alleged agreement sued upon was a mere price list. (6) There was no consideration for the agreement to keep the price and terms open till January 1, 1904, and the agreement to keep the promise open for the designated period was not obligatory on either side.

*Kinealy & Kinealy* for respondent.

(1) The judgment of the court against appellant upon its cross-bill was correct. Meredith v. Holmes, 105 Mo. App. 343. (2) The contract here involved is amply sufficient to support an action for damages for its breach. Laclede Con. Co. v. Moss Tie Co., 185 Mo. 25; Green v. Higham, 161 Mo. 333; Black River Lumber Co. v. Warner, 93 Mo. 374; Rhodes v. Holladay-Koltz Co., 105 Mo. App. 279; Am. Linseed Co. v. Eberson, 104 S. W. 121; Nelson v. Hirsch, 102 Mo. App. 498. (3) The court correctly instructed the jury as to the measure of damages. Warren v. Mayer Mfg. Co., 161 Mo. 112; Bank v. Ragsdale, 171 Mo. 168; Black River Lumber Co. v. Warner, 93 Mo. 374; Range Co. v. Mercantile Co., 120 Mo. App. 438.

WOODSON, J.—The plaintiff sued the defendant in the circuit court of the city of St. Louis to recover some ten thousand dollars. The petition contained three counts. The first was predicated upon the following written contract, whereby the defendant purchased of plaintiff one thousand tons of bar iron, to-wit:

"Order No. 22917.

"St. Louis Car Company,

"St. Louis, Mo., 6—3—03.

"To Moran Bolt and Nut Mfg. Co.,

"Please furnish this company with the following material and ship same to ......................

"Enter our order for, 1,000 net ton of bar iron at $1.70 per 100 lbs., F. O. B., our works, half card extra. No charge for cutting to length 5 feet or over.

"Specifications to be furnished during the balance of the year.

"Terms 30 days net from date of arrival of material.                    Yours very truly,

"St. Louis Car Co.,

"By Abe Cook, Pur. Agt."

*Letter of Acceptance.*

"St. Louis, June 10, 1903.

"St. Louis Car Company, City.

"Gentlemen:

"We are pleased to acknowledge receipt of your contract of June 3d for 1,000 tons bar iron, order No. 22,917. We are also in receipt of your order No. 22,944 for, estimated, 98,000 pounds of iron. We forward this order to the mill with the request to make prompt shipment.      Respectfully yours,

"MORAN NUT AND BOLT MANUFACTURING Co."

It was further alleged that under this contract plaintiff delivered to defendant a total amount of 961,550 pounds, and judgment was sought for the balance due on account of the material so delivered.

The second count was for damages because of the failure and refusal of the defendant to specify, accept and receive the balance of 1,038,450 pounds of bar iron covered by the above contract.

The third count was for a balance due on account of bolts and nuts sold to the defendant.

The defendant's answer was a general denial and a cross-bill wherein it set up that on the 3d day of June, 1903, it entered into a contract with the plaintiff which as written was of the purport set out in the petition; that that contract was negotiated with one Fletcher as the agent of plaintiff, and that thereafter the defendant delivered to the plaintiff certain merchandise falling within the contract, and that the defendant paid for everything it purchased from plaintiff except the sum of $3,171.38, which was tendered to plaintiff on the 9th day of February, 1904; that the writing constituting the agreement between plaintiff and defendant was executed on behalf of the defendant by Abe Cook, who was the purchasing agent of the defendant, and that he had no power to bind the defendant by any such contract, and that the con-

tract set out in that writing was not the agreement which was really made between said Cook and Fletcher, and praying that the written contract might be reformed in order to conform with the real agreement made so as to read as follows:

"Enter our order for all or such part of one thousand net tons of bar iron as we may require between this date and the 31st day of December of the current year at $1.70 per one hundred pounds, f. o. b. our works, half iron card extra. No charge for cutting to lengths of five feet or over. Specifications to be furnished, as such iron is required during the balance of the year. Terms, thirty days net from date of arrival of material."

The reply was a general denial.

Counsel for plaintiff has made a correct, terse statement of the facts of the case as disclosed by the record, and we will adopt that statement, which is substantially as follows:

The equitable issues growing out of the defendant's cross-bill were tried by the court before the issues arising upon the plaintiff's petition were submitted to a jury. On the trial of the issue raised by the defendant in its prayer for the reformation of the written contract, Abe Cook was the defendant's only witness in chief. He testified that he understood that Mr. Fletcher was acting for plaintiff, and his impression was that Mr. Fletcher told him that defendant was not to be required to take out the whole amount of one thousand tons mentioned in this contract, but that he had to have the contract in that shape because it was the customary way of making them out. He also said that from the wording of the contract he thought it was dictated by his assistant, and that if the assistant did dictate it then he must have gotten the instructions as to its terms from the witness. The original order showed that it had first been addressed to John

Coles & Co., and that afterwards the name of this firm had been scratched out and that of Moran Bolt and Nut Mfg. Co. written in.　Mr. Cook was in no way certain as to his conversations with Mr. Fletcher. The plaintiff showed that Mr. Fletcher was not in the employ of the plaintiff but was a broker working on commission; that he went to the St. Louis Car Co., learning that they were in the market for a large tonnage of iron, and Mr. Cook told him that they would place an order for five hundred tons.　Mr. Fletcher went away and inquired and came back to Mr. Cook and told him that he could not place the order for that amount and that the tonnage would have to be increased.　Although Mr. Cook demurred about giving an order for so much as a thousand tons, yet he caused an order addressed to John Coles & Co. to be written ordering a thousand tons at $1.70.　John Coles & Co. were mill men and Mr. Fletcher took it to them and they refused it.　Other mills to which Mr. Fletcher submitted the order refused to fill it and finally he took it to Mr. Gorman, president of plaintiff, and the latter, after considering the matter, told Mr. Fletcher that if he would go back to the car company and have the order changed so as to be addressed to plaintiff they would take the business at $1.70.　The market price at that time for that material was about $1.80.　A few days after that defendant called plaintiff's attention to the fact that that order had not been accepted and requested its acceptance in writing, and thereupon Mr. Gorman, on behalf of plaintiff, wrote a letter formally accepting the order.　After the contract was executed, the defendant specified out nearly five hundred tons of the material and every time a specification was given it purported to be at "price as per contract;" that there was very little specified out after the first of August, 1903, at which time the price of iron had declined considerably, towards the end of the year

210 Sup.—46

reaching as low a point as $1.20. During the fall the plaintiff on numerous occasions called the defendant's attention to the fact that they were not specifying out the iron according to the agreement, and urging upon them to do so and in several instances calling their attention to the exact amount still remaining to be specified before December 31, 1903.

The court found against the defendant and refused the relief asked by it for a reformation of the contract.

Afterwards, the cause came on for trial before a jury on the causes of action set out in the plaintiff's petition. On that trial the only real matter in dispute was the second count of the petition, and on that there is no substantial difference between the witnesses for the plaintiff and those of the defendant. The evidence of all the witnesses was to the effect that a number of years ago the National Association of Iron Manufacturers got together and agreed upon what was known as a card. This card gave a base price for bars of iron within certain specified dimensions for the various shapes and a small extra charge per hundred pounds for sizes that varied from the specified base sizes. For example, all bar iron is manufactured in lengths of about sixteen feet but of various shapes, such as round, square, flat and oval. In square iron, for example, all pieces of dimensions between one inch square and $1\frac{1}{2}$ inches square would carry the base price which depends upon the market value of iron. Any size of square iron exceeding $1\frac{1}{2}$ inches square for instance would carry a small extra price of, say, one-tenth of a cent per hundred pounds. This extra price was fixed and was specified upon the card and was known as the "card extra." So in round iron the base would be from one inch to $1\frac{1}{2}$ inches in diameter, and in the same way this National card gave the limits

of the sizes for the "base" for all the shapes.   Anything within the limits of these sizes, that is to say, which where base, bears a fixed price; for example, under the contract here in question, $1.70 per hundred pounds, and anything outside of the base sizes, carry in addition to the base an extra designated charge per hundred pounds for each size on the card, and in the contract between the parties to this suit these extra sizes, if specified by the defendant were to carry out the whole "card extra" but only one-half of the extra price designated on the card.

The evidence also showed that at the time this contract was made, to-wit, June 3, 1903, the plaintiff had in its warehouse about a thousand tons of iron, and thereafter made contracts with various mills for iron which under those contracts it was required to specify out to a certain extent each month, and some of which it was unable to specify out by December 31, 1903, as contracted, because of the failure of the defendant to accept all the iron contracted for under the contract here in question.   By specifying out is meant furnishing specifications or designations of the kind of iron desired for delivery.   At the time the contract was made the market price of iron, that is to say, the base for iron bars, was $1.80 or $1.82½ per hundred pounds at St. Louis.   Thereafter the price declined steadily during the balance of the year, 1903, and during the late spring of 1904.   In the fall of 1903, when the price of iron had gotten down to about $1.35, the defendant purchased iron of the same character as that covered by its contract with plaintiff from concerns other than plaintiff.   On the 31st of December, 1903, the market price of iron delivered at the defendant's work and under the terms set forth in the contract in question was $1.20 or $1.25.   Towards the end of the year plaintiff on numerous occasions wrote and sent to defendant, requesting it to specify

out iron under its contract and calling its attention in several communications to the exact amount still remaining to be specified before December 31, 1903. The iron was sold by Mr. Fletcher on commission basis and plaintiff paid him before the end of the year a total commission of $250, or twenty-five cents a ton. Between June 3, 1903, and December 31, 1903, the total amount of iron specified out by the defendant and received by it under the contract in question was 961,550 pounds, out of the total amount of two million pounds covered by the contract.

In February, 1904, the defendant tendered to plaintiff a check for $3,171.38 in full of all amounts due plaintiff. This check plaintiff returned since it simply covered the amount due for all the material received by the defendant under the contract and also for all bolts and nuts purchased by it during that time, but did not cover the loss sustained by plaintiff on account of the failure of the defendant to accept all the iron contracted for. During the time the contract was in existence, the defendant paid to plaintiff at different times various sums of money, all of which were credited to the defendant as a general credit without specifying any particular account to which they should be applied, and the amount of the check tendered plaintiff was the balance then due plaintiff on the cause of action mentioned in the first and third counts of the petition after giving defendant credit for all sums which it had paid. The court instructed the jury that they might apply the cash payments made by the defendant to the first and third counts of the petition in such proportion as they thought proper from the evidence.

The court then instructed the jury as follows:

"1. The court instructs the jury that the written order numbered 22,917, given by defendant to the plaintiff, together with plaintiff's letter of June 10, 1903,

constituted a contract whereby the defendant became obligated and bound to accept from plaintiff one thousand net tons of bar iron according to specifications to be furnished by defendant to plaintiff during the time between June 3, 1903, and December 31, 1903, to be paid for by defendant at the rate of $1.70 for each one hundred pounds delivered at defendant's works, with extra prices known to the trade as half iron card extra, in addition to said price of $1.70, and defendant to make no charge for cutting said bar iron into lengths specified.

"2.   The court instructs the jury that in the first count of the plaintiff's petition it sues for $16,981.77 as the contract price of 961,550 pounds of bar iron sold and delivered to defendant under the contract mentioned in the first instruction given you, and if you believe from the evidence that the plaintiff under said contract delivered to the defendant, according to specifications furnished it, certain bar iron, then you will find in favor of the plaintiff and against the defendant on the first count of plaintiff's petition, for the amount due plaintiff at the prices named in said contract as set forth in Instruction No. 1 for whatever amount of bar iron the plaintiff so delivered to the defendant under said contract less such sums as have been paid by the defendant to the plaintiff, and credited on said account, or which the jury under the other instructions given you credit thereon, and to the amount, if any, thus found, you will add interest at the rate of six per cent per annum from the date plaintiff made demand on defendant for the amount, if any, so due it, if you find from the evidence such demand was made, up to the present day, and if from the evidence you cannot determine the date of such demand, if any was made, then you will allow said interest from the date of the bringing of this suit, viz., February 17, 1904.

"3. The court instructs the jury that in the second count of the plaintiff's petition the plaintiff sues the defendant for loss alleged to have been sustained by plaintiff because of the alleged failure of defendant to specify and accept under the contract mentioned in the first instruction the whole amount of said one thousand net tons of bar iron, and if the jury believe from the evidence that during the time between June 3, 1903, and December 31, 1903, inclusive, the defendant refused to furnish specifications for the total amount of said one thousand net tons of iron and had not received said amount from the plaintiff as provided in said contract, then the jury will find in favor of the plaintiff and against the defendant on the second count of the petition and assess the plaintiff's damages thereon at such a sum as the jury believe from the evidence is the difference in value for the amount of iron which the defendant so refused to specify and accept under said contract between the price mentioned in said contract and the reasonable market value of such bar iron on the 31st day of December, 1903, if delivered and manufactured in the manner provided in said contract.

"4. The court instructs the jury that in the third count of the plaintiff's petition the plaintiff sues the defendant for $3,514.84 as the value of certain bolts and nuts alleged by plaintiff to have been sold by it to defendant, and set forth in the itemized account attached to the petition and marked Exhibit B; and if you believe from the evidence that the plaintiff sold and delivered to the defendant said nuts and bolts or any part thereof, then you will find in favor of the plaintiff for the value of such nuts and bolts so sold and delivered to the plaintiff, less such sums, if any, as have been paid by plaintiff to defendant, and have been applied on said account, or which the jury under other instructions given you shall apply thereon and

to the amount, if any, thus found you will add interest at the rate of six per cent per annum from the date plaintiff made demand on defendant for the amount, if any, so due it, if you find from the evidence such demand was made, up to the present day, and if from the evidence you cannot determine the date of such demand, if any was made, then you will allow said interest from the date of the bringing of this suit, viz., February 17, 1904.

"5. The court instructs the jury that if you believe from the evidence that between the 3d of June, 1903, and the 31st of December, 1903, the defendant paid to the plaintiff various sums of money without specifying to what the sums so paid should be applied, and that the plaintiff at the time it received said various payments did not apply same to any particular item or account, then the jury may distribute as credits the total amount of money so paid by defendant to plaintiff during said time, between the causes of action set forth in the first and third counts of plaintiff's petition in such proportion as the jury from the evidence may think proper.

"And the court further instructs the jury that the plaintiff admits that the total amount it received from the defendant on account of the matters alleged in the first and third counts of plaintiff's petition is the total sum of seventeen thousand three hundred and twenty-five dollars and twenty-three cents.

"6. The court further instructs the jury that they should in their verdict make a separate finding on each count of the plaintiff's petition, and if on any account your finding includes interest, you should calculate the amount of the interest and add to it the sum upon which the interest is calculated and render your verdict on such count for the total of both.

"7. The court instructs the jury that nine of your number have the power to find and return a ver-

dict, and if less than the whole of your number, but as many as nine, agree upon a verdict, the same should be returned as the verdict of the jury, in which event all of the jurors who concur in such verdict shall sign the same.

"If, however, all of the jurors concur in the verdict, your foreman alone may sign it."

To the giving of which said instructions, as each and every thereof was given to the jury, the defendant at the time objected because such instructions were irregular, illegal and not proper instructions under the issues joined in this case; which said objection was overruled by the court, and to which action of the court the defendant at the time excepted.

Thereupon, the defendant requested the court to give the jury the following instruction, which the court refused, and the defendant duly saved its exceptions:

"The court instructs the jury that under the pleadings and evidence the plaintiff is not entitled to recover upon either the first or second counts of the petition, and they will accordingly return a verdict in favor of the defendant upon both the first and second counts of the petition."

The case being then submitted, a verdict was rendered against the defendant for the sum of $182.43 on the first count; $4,673.03 on the second count, and $3,193.50 on the third count, or $8,048.96.

After unavailing motions in arrest and for new trial, this appeal was allowed.

I.   While the defendant pleads in its answer that Abe Cook, the person who signed the contract of purchase sued on, had no authority to execute it on its behalf, yet no such question is presented here in the brief of counsel for appellant; and for that reason we will dismiss it in the further consideration of the cause.

II.   The first contention presented by the appellant for consideration is the action of the trial court in

refusing to reform the contract sued on, as asked for in its cross-bill.

That a court of equity has the authority to reform a written contract, where it is shown by the evidence that through fraud or by mistake it does not express the real contract entered into by the parties, cannot be denied; but the respondent contends that there is no evidence in this record which establishes any such fraud or mistake. After a careful reading of the entire evidence upon that subject, we have no hesitancy in saying that the evidence is wholly insufficient to sustain the charge of mistake as stated in the cross-bill. Mr. Cook was the only witness who testified for appellant upon that subject, and he refused to state positively that the contract did not state the true intention of the parties thereto, but contented himself by testifying that he believed that the contract was to the effect that he was to take all or such part of the one thousand tons of iron as the appellant might need.

This evidence falls far short of the legal requirement in that regard. In equitable proceedings to reform a written contract on the ground of mistake, the burden of proof rests upon the party who asserts it, and he must establish its existence by clear and convincing evidence, and if he fail to do so, the relief prayed will be denied. [State ex rel. v. Frank's Admr., 51 Mo. 98; Judson v. Mullinax, 145 Mo. 630.]

In addition to pointing out the inherent weakness of the appellant's evidence upon this question, we will add that the respondent's evidence, which seems to be equally creditable, squarely contradicted that of the former and tends to prove that the contract, as written, expresses the true terms of the agreement as entered into, and that no mistake was made in reducing it to writing. Even though appellant's evidence had been equally clear and positive as that of the respondent, still the relief asked would have to be denied, for

the reason that in the absence of a preponderance of the evidence in its favor, the contract must stand as written; otherwise, written contracts would become worthless and not worth the paper upon which they are written.

We are, therefore, of the opinion that the court correctly found and adjudged that there was no mistake attending the execution of the contract in suit.

III.    The real bone of contention in this case is lodged in the second count of the petition, which asks for $5,000 damages against the appellant for refusing to receive all the iron purchased under the contract sued on.

The plaintiff's contention is, that by the contract it sold to defendant a specific quantity of bar iron, to be delivered upon call, at any time prior to January 1, 1904, for a certain price, and that defendant refused to receive all of the iron so purchased, and that, by reason thereof, plaintiff was damaged in the sum sued for.

The defendant, however, places an entirely different construction upon the contract, and contends that it is a wholly unilateral agreement depending upon its own will and volition, and otherwise void for want of mutuality.

In other words, defendant insists that the contract relates to "bar iron;" and that the testimony shows that the words "bar iron" cover very many different sizes and shapes of manufactured iron of varying prices; and that until made particular by specific orders no contract for "bar iron" is possible of understanding or fulfillment.

Instructions numbered one and three, given by the court, adopt plaintiff's construction of the contract, and repudiate defendant's construction thereof. The defendant complains that those instructions are erroneous.    In support of that contention the defend-

ant cites and chiefly relies upon the case of Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77.

The facts in that case were as follows:

The plaintiff sued on an account for $5,573.43. "The defendant, in its answer, denied the averments of the petition, and pleaded a counter-claim for $5,341.94, damages for failure of plaintiff to deliver to the defendant after June 1st, 1899, certain manufactured articles which it ordered and needed, and which the defendant alleged the plaintiff was bound to deliver under an alleged written contract," made and entered into by and between them, which is as follows:

"Kansas City, Mo., Oct. 27, '98.

"C. E. Ullman, Esq., Purchasing Agent, Cold Blast Transportation Co., S. & S. Packing Co.—

"Dear Sir:    We offer to deliver at your works, during six months from November 1st, 1898, the following materials at the prices stated:

Bar iron, $1.20 flat delivered by car—$1.25 by wagon.

Soft steel bars, $1.25, car load—$1.30 by wagon.

Machine bolts, 80 and 10 % discount.

U. S. Std. square nuts $6.50 off.

U. S. Std. hex. nuts $7.40 off.

70 % off extras for tapping.

And will take in part payment No. 1 wrought scrap at $8.50 net ton, or arch bars and transoms at $10.50 net ton, or wrought iron car axles at $12.50 net ton, delivered your works; the quantity of scrap to be taken not to exceed the weight of materials sold to you.                    Yours truly,

"R. C. Howes, Sec'y.

"With option of renewal for 6 months from June 1st, 1899.

"The K. C. Bolt & Nut Co.,
"R. C. Howes, Sec'y."

"On receipt of the proposition contained in this letter, the defendant accepted it; and between November 1, 1898, and June 1, 1899, it ordered, the plaintiff delivered, and the defendant paid for, nuts, bolts, and bars of the character specified in the letter, under the terms and at the prices there stated. Before June 1, 1899, the defendant notified the plaintiff that it exercised its option to renew the contract evidenced by the letter and acceptance. Between June 1, 1899, and December 1, 1899, the defendant ordered of the plaintiff nuts, bolts and bars of the character described in the letter, which it needed in its business, which the plaintiff refused to deliver, and which the defendant was forced to purchase of others at prices which, in the aggregate, exceeded those specified in the alleged contract between the parties by $5,341.94."

There was a judgment for the defendant, and the plaintiff sued out a writ of error. In the construction of that contract in the United States Circuit Court of Appeals, Mr. Justice SANBORN said:

"The rules applicable to contracts of this class may be thus briefly stated: A contract for the future delivery of personal property is void, for want of consideration and mutuality, if the quantity to be delivered is conditioned by the will, wish, or want of one of the parties; but it may be sustained if the quantity is ascertainable otherwise with reasonable certainty. An accepted offer to furnish or deliver such articles of personal property as shall be needed, required, or consumed by the established business of the acceptor during a limited time is binding, and may be enforced, because it contains the implied agreement of the acceptor to purchase all the articles that shall be required in conducting his business during this time from the party who makes the offer. [Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Minnesota Lumber Co. v. Whitebreast Coal Co. (Ill.

Sup.), 43 N. E. 774, 31 L. R. A. 529; Parker v. Pettit, 43 N. J. Law 512.] But an accepted offer to sell or deliver articles at specified prices during a limited time in such amounts or quantities as the acceptor may want or desire in his business, or without any statement of the amount or quantity, is without consideration and void, because the acceptor is not bound to want, desire, or take any of the articles mentioned. [Bailey v. Austrian, 19 Minn. 535 (Gil. 465); Tarbox v. Gotzian, 20 Minn. 139 (Gil. 122); Railroad v. Bagley, 60 Kan. 424, 433, 56 Pac. 759; Oil Co. v. Kirk, 15 C. C. A. 540, 68 Fed. 791; Crane v. C. Crane & Co., 45 C. C. A. 96, 105 Fed. 869.] Accepted orders for goods under such void contracts constitute sales of the goods thus ordered at the prices named in the contracts, but they do not validate the agreements as to articles which the one refuses to purchase, or the other refuses to sell or deliver, under the void contracts, because neither party is bound to take or deliver any amount or quantity of these articles thereunder. [Crane v. C. Crane & Co., 45 C. C. A. 96, 105 Fed. 869; Oil Co. v. Kirk, 15 C. C. A. 540, 68 Fed. 791; Campbell v. Lambert, 36 La. Ann. 35; Railroad v. Mitchell, 38 Tex. 85, 95; Ashcroft v. Butterworth, 136 Mass. 511, 514; Drake v. Vorse, 52 Iowa 417, 3 N. W. 465; Thayer v. Burchard, 99 Mass. 508, 520; Hoffmann v. Maffioli (Wis.), 80 N. W. 1032, 1035, 47 L. R. A. 427; Railroad v. Jones, 53 Ill. App. 431, 437; Rafolovitz v. Tobacco Co. (Sup.), 25 N. Y. Supp. 1036.]

"Tested by these rules, the accepted offer of October 27, 1898, was void in its inception for want of consideration and mutuality. No quantity of nuts, bolts, or bars was named in the offer or in the acceptance. The defendant was not bound to order, to receive or to pay for any of the articles named in the offer; and there was therefore no consideration for the offer itself, and no mutuality in the supposed

agreement.    The orders which were made and filled prior to June 1, 1899, constituted valid contracts for the purchase and sale of the goods so ordered at the prices named in the offer.    But they effected no agreement on the part of the defendant to order, or on the part of the plaintiff to deliver, any other goods under the offer, because the amount of goods whose delivery was contemplated was still unnamed.    The defendant was not legally bound to order, to receive, or to take any articles which it had not ordered, so that there was still no consideration and no mutuality in the contract as to any articles which the defendant had not ordered, or which the plaintiff had not delivered.    The refusal of the plaintiff to honor the orders of the defendant was therefore no breach of any valid contract, and formed no legal cause of action for the counterclaim.''

By reading the contract involved in the case just cited, it will be observed that there was no specified. quantity of nuts, bolts or bars named in the written offer of sale or in the acceptance of that offer, by the defendant; and for that reason the court held the contract to be unilateral and void.    But in discussing that case, the court clearly differentiated that contract from that class of contracts where the quantity sold is stated in the contract, or which may be made certain by the exercise of the provisions contained in the contract, or from what is necessarily implied from what is stated therein.    In discussing that difference the court used this language:    ''An accepted offer to furnish or deliver such articles of personal property as shall be needed, required, or consumed by the established business of the acceptor during a limited time is binding, and may be enforced, because it contains the implied agreement of the acceptor to purchase all the articles

that shall be required in conducting his business during this time from the party who makes the offer."

In the case at bar the quantity sold is stated, "1000 net ton of bar iron at $1.70 per 100 lbs. F. O. B. our works, half card extra." This provision of the contract clearly takes it out of the operation of the law applicable to the class of cases mentioned by Mr. Justice SANBORN, in the case just cited.

The evidence both for plaintiff and defendant shows that the words "bar iron" and "half card extra" as used in the contract have reference to a certain base size and prices for bar iron. That is, bar iron is made in various sizes, and that there is a difference in the cost of making iron above the base size; and the words "card extra" refer to a list of prices stated on a card, which is well known to the trade, which states the extra charges for bar iron which is above the base size; and the words "half card extra" mean one-half of the extra charges stated on the card of prices.

The action of the parties to this contract in giving and filling orders thereunder has given precisely the same constructions to the terms "bar iron," "specifications," and "half card extra" as were given orally by the witnesses who testified on that subject. And it is well settled law, that oral evidence is admissible to prove the meaning of words used in a written contract where they have a special or technical meaning in the connection in which they are used, and where it is shown that all the parties to the contract were familiar with the words and the sense in which they were employed.

In the case of Laclede Con. Co. v. Moss Tie Co., 185 Mo. l. c. 62, this court said: " 'Putting a construction upon a document means ascertaining the meaning of the sign or words made upon it, and their relation to facts. . . . . In order to ascertain the

relation of the words of a document to facts, every fact may be proved to which it refers, or may have been intended to refer, or which identifies any person or thing mentioned in it.' . . . . The writing or contract should be read in the light of surrounding circumstances in order the more perfectly to understand the intent and meaning of the parties." [See, also, Black River Lumber Co. v. Warner, 93 Mo. 374; Chapman v. Railroad, 146 Mo. 481; Rhodes v. Land & Lumber Co., 105 Mo. App. 279; Blair v. Corby, 37 Mo. 313.]

By applying to the contract in question the following language of this court in Laclede Con. Co. v. Moss Tie Co., supra, there can be no doubt but what both parties to the contract understood and knew the meaning thereof, to-wit: " 'Tell me what you have done under a deed, and I will tell you what that deed means.' Another way of expressing the doctrine that the particular construction placed upon any instrument by both parties thereto is strong evidence of what they both intended it to mean." [Patterson v. Camden, 25 Mo. l. c. 21.]

Under the light of this evidence and the authorities mentioned, we are unable to lend our concurrence to the contention of appellant, that the contract is unilateral and void for want of mutuality; but, upon the other hand, we are of the opinion that the contract is mutually binding on both parties thereto, and specifically states the quantity, kind and price of the goods sold, and it specifies the time in which they were to be delivered.

And the refusal of the defendant to specify and accept the goods in conformity to the terms of the contract constituted a breach thereof and entitled the plaintiff to recover the consequential damages that flowed therefrom.

These conclusions are fully sustained by the following authorities:    Laclede Con. Co. v. Moss Tie Co., supra; Green v. Higham, 161 Mo. 333; Black River Lumber Co. v. Warner, supra; Rhodes v. Land & Lumber Co., supra; Am. Linseed Co. v. Eberson, 104 S. W. 121; Nelson v. Hirsch & Sons Co., 102 Mo. App. 498; Hinckley v. Pittsburgh Steel Co., 121 U. S. 264.

Instructions numbered one and three given by the court on behalf of plaintiff and objected to by the defendant are predicated upon the law as above declared, and, according to the authorities above cited, they correctly told the jury what was the proper measure of damages in the case.    [See Range Co. v. Mercantile Co., 120 Mo. App. 438.]

IV.    The appellant concedes that it owes the respondent the sums of money sued for in the first and third counts of the petition, and, consequently, it assigns no error to the action of the trial court in regard to those counts.

Finding no error in the record, we are of the opinion that the judgment should be affirmed; and it is so ordered.

All concur; *Lamm, J.,* in the result.