# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 07-2057/2171

———————

Structural Polymer Group, Limited;     *
Structural Polymer Systems, Limited,   *
                                       *
　　Appellees/Cross-Appellants,        *
                                       *   Appeals from the United States
　　v.                                 *   District Court for the
                                       *   Eastern District of Missouri.
Zoltek Corporation,                    *
                                       *
　　Appellant/Cross-Appellee.          *

———————

Submitted: January 14, 2008
Filed: October 8, 2008

———————

Before COLLOTON and SHEPHERD, Circuit Judges, and ERICKSON,[1] District Judge.

———————

COLLOTON, Circuit Judge.

　　A jury awarded Structural Polymer Group and Structural Polymer Systems (together SP) $36,044,895 in lost profits from Zoltek Corporation for breach of a requirements contract for the sale of carbon fiber. The district court[2] reduced the

———————

[1]The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota, sitting by designation.

[2]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

award to $21,138,518, finding the remainder of the award duplicative. Zoltek appeals the district court's denial of its motion for a new trial and motion for judgment as a matter of law. Structural Polymer cross-appeals the district court's modification of the jury's damages award.[3] We affirm.

I.

Zoltek is a Missouri corporation that manufactures and sells carbon fiber. SP are British corporations that manufacture a strong, light-weight building material produced using carbon fiber called "prepreg." Prepreg is made by weaving carbon fiber into textile-like sheets and then impregnating the sheets with liquid resin. The prepreg sheets are then sold to builders who can mold them into different shapes for a variety of applications. Used in this way, prepreg is a common substitute for fiberglass. One common application for prepreg is the manufacture of wind energy turbine blades.

The parties entered into a Supply Agreement in November 2000. Under the disputed agreement, Zoltek promised to manufacture and sell to SP all of SP's requirements between November 6, 2000, and December 31, 2010, for "Large Filament Count Carbon Fibers (Carbon Fibers) as defined by PANEX 33 specifications," at "then-current market price." SP, in turn, promised to "obtain their total requirements for suitable quality, in the reasonable opinion of [SP], Carbon Fibers from [Zoltek]," the volume not to exceed "the amount actually purchased by [SP] in the preceding Contract Year plus one million (1,000,000) pounds." "Large Filament Count," or large-tow carbon fiber, contains 48,000 or more filaments per bundle. "Small-tow" carbon fiber, by contrast, contains fewer than 48,000 filaments

_____

[3]SP also raised in its opening brief a challenge to the district court's denial of SP's demand for specific performance of the contract, but SP later withdrew that portion of the cross-appeal, after terminating the Supply Agreement effective February 29, 2008.

per bundle, commonly 24,000 or fewer filaments per bundle. Small-tow is more expensive to produce, but superior in quality.

When the Supply Agreement was formed, most manufacturers used small-tow carbon fiber. The purpose of the agreement was to develop a new market for large-tow fiber as a less expensive alternative to small-tow fiber in the wind-energy industry.

Before April 2002, Zoltek produced a large-tow carbon fiber product called Panex 33. SP purchased 28,219.17 and 20,943.91 pounds of Panex 33 from Zoltek under the Supply Agreement in 2000 and 2001, respectively. SP placed an order for 1,763.70 pounds of Panex 33 in 2002, but returned it due to alleged quality defects. In April 2002, Zoltek stopped manufacturing Panex 33, and started making a large-tow carbon fiber product called Panex 35. SP ordered no Panex 33 or 35 in 2003. SP ordered and received 548,935 pounds of Panex 35 in 2004.

The dispute in this case centers on two orders that SP placed with Zoltek in 2005 and 2006 that were never filled. SP ordered 1,480,138 pounds of Panex 35 in 2005, and claims that it was entitled to 2,480,138 pounds of Panex 35 in 2006.

On February 22, 2005, SP sued Zoltek for breach of contract alleging lost profits through December 31, 2006, and future lost profits through December 31, 2010. Because the parties disputed whether the Supply Agreement entitled SP to both Panex 33 and Panex 35, SP's damages expert made alternative lost profit calculations: $21,138,518 in then-current lost profits under Count I corresponding to 3,960,276 pounds of Panex 35, and $14,906,377 in then-current lost profits under Count II corresponding to 3,000,000 pounds of Panex 33.

On November 29, 2006, a jury awarded SP lost profits under both counts through December 31, 2006, but declined to award SP future lost profits. The district

court vacated the award under Count II as duplicative, giving SP a final sum of $21,138,518. Zoltek filed motions under Federal Rule of Civil Procedure 59(a) for a new trial, and under Rule 50(b) for judgment as a matter of law, in connection with both the liability and damages phases of the proceedings, and the district court denied both motions. Zoltek appeals the district court's denial of those motions. SP cross-appeals the district court's vacation of the jury's award under Count II of the complaint.

II.

We review the district court's denial of Zoltek's motion for judgment as a matter of law *de novo* to determine whether there is sufficient evidence to support the verdict. *Duty v. Norton Alcoa-Proppants*, 293 F.3d 481, 488 (8th Cir. 2002). In reviewing the sufficiency of the evidence to support the jury's verdict, we interpret the record in a light most favorable to the prevailing party, affirming unless no reasonable juror could have reached the same conclusion. *Anderson Marketing, Inc. v. Maple Chase Co.*, 241 F.3d 1063, 1065 (8th Cir. 2001). We review the denial of a motion for a new trial for an abuse of discretion. *The Shaw Group, Inc. v. Marcum*, 516 F.3d 1061, 1067 (8th Cir. 2008). A new trial motion premised on a dispute about the strength of the supporting proof should be granted only "if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice." *Id.* (quotation omitted).

Zoltek argues that the district court erred in four ways. First, Zoltek argues that the district court erred by refusing to allow it to raise two arguments to the jury. Zoltek sought to urge that the Supply Agreement was void for lack of mutuality of obligation. The district court concluded that Zoltek's argument was an affirmative defense, which Zoltek waived by failing to plead it, and the district court then denied as untimely Zoltek's motion to amend its complaint to add a mutuality defense. Second, the district court ruled that Zoltek failed to make a submissible case that SP

-4-

had abandoned the Supply Agreement. Third, Zoltek argues that the district court failed to remedy unfairly prejudicial testimony at trial. Fourth, Zoltek argues that the jury's damages award to SP was not based on adequate evidence, that the district court erred by allowing SP to amend its damages calculations twenty-two days before trial, that SP's revised damages calculations were inadequate as a matter of law, and that the district court instructed the jury incorrectly in connection with the damages phase of the proceedings.

A.

We first consider Zoltek's objection to the district court's resolution of arguments concerning mutuality of obligation. Zoltek urged that the Supply Agreement was "unenforceable as a requirements contract due to a lack of mutuality," which is in essence an argument that SP failed to show that the Supply Agreement was supported by valid consideration. *See* Restatement (Second) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of . . . 'mutuality of obligation.'"); *USA Chem, Inc. v. Lewis*, 557 S.W.2d 15, 24 (Mo. Ct. App. 1977); *Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517, 521 (8th Cir. 1987). We conclude that whether or not Zoltek's contention should not have been characterized as an affirmative defense, the district court correctly ruled in the alternative that the Supply Agreement contained mutuality as a matter of law.

SP contends that our decision in *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1368 (8th Cir. 1991), establishes that "lack of consideration" is an affirmative defense that is waived if not raised in an answer. *Overholt* held that it was unnecessary to reach the merits of an argument that certain restrictive covenants in a contract were "void for lack of consideration," because the defendants "waived this affirmative defense by failing to raise it in their answer, *see* Fed. R. Civ. P. 8(c), and by failing to identify any relevant exceptions to this general rule." *Id*. at 1368. Zoltek counters with our statement in *First Union Nat'l Bank v. Pictet Overseas Trust Corp*.,

477 F.3d 616 (8th Cir. 2007), that whether a contention "is an affirmative defense is a question of [ ] state law," *id*. at 621-22, and with Missouri authority that distinguishes between "failure of consideration," which is an affirmative defense applicable where consideration that once existed becomes worthless or non-existent, and "lack of consideration," which is an element of the claim that cannot be waived through failure to plead. *Ennis v. McLaggan*, 608 S.W.2d 557, 561 (Mo. Ct. App. 1980); *MFA Inc. v. Dettler*, 817 S.W.2d 658, 663 (Mo. Ct. App. 1991).

Assuming for the sake of argument that Zoltek's argument regarding lack of consideration need not be pleaded as an affirmative defense, we agree with the district court that the Supply Agreement was supported by adequate consideration as a matter of law. Under Missouri law, "whether consideration is sufficient to establish a contract is normally a question of law for the court and not a question of fact for the jury." *Allison v. Agribank, FCB*, 949 S.W.2d 182, 188 (Mo. Ct. App. 1997). Missouri law long has followed a rule that "[w]hen a party relies upon a writing or a number of writings to establish a contract, it is unquestionably the province of the court to determine from the writing or writings whether or not a contract was entered into." *Nelson v. Cal Hirsch & Sons' Iron & Rail Co.*, 77 S.W. 590, 594 (Mo. Ct. App. 1903).

Zoltek advances three reasons why the contract lacked mutuality of obligation. All three are based on an allegation that SP's requirements under the agreement are "hopelessly manipulable" and determined by SP's subjective preferences, rather than by objective criteria outside of SP's control. Specifically, Zoltek argues that "SP could at all times order or not order Zoltek fiber as it wanted" because (1) SP had zero requirements for large-tow fiber when the contract was formed, (2) the price protection clause gave SP the option "to purchase carbon fibers from other producers" whenever SP wanted to, and (3) SP was free to buy small-tow fiber, which Zoltek alleges is "interchangeable" with large-tow fiber, in place of large-tow whenever it pleased.

First, we disagree with Zoltek that the Supply Agreement lacks mutuality if SP had zero requirements for large-tow fiber when the contract was formed. A duty of good faith is implied in requirements contracts under Missouri law, *see* Mo. Rev. Stat. § 400.2-306(1) (1994); *Home Shopping Club, Inc. v. Roberts Broad. Co.*, 989 S.W.2d 174, 179 (Mo. Ct. App. 1998), and this "implied obligation of good faith is enough to avoid finding a contract null and void due to an illusory promise." *Magruder Quarry & Co., v. Briscoe*, 83 S.W.3d 647, 650-51 (Mo. Ct. App. 2002); *see also National Refining Co. v. Cox*, 57 S.W.2d 778, 781 (Mo. Ct. App. 1933). The Supply Agreement bound SP to order product from Zoltek in good faith, and if SP failed to purchase anything from Zoltek during the term of the agreement, then the contract allowed Zoltek to allege that SP acted in bad faith by failing to make purchases. An assertion of bad faith, however, is an argument that SP *breached* the agreement, not that the agreement lacked mutuality or consideration in the first place. The district court's ruling on Zoltek's proposed defense did not foreclose it from arguing to the jury that SP breached the agreement.

Second, we disagree with Zoltek that the price protection clause in the contract made SP's obligation illusory. The price protection clause gave Zoltek a right of first refusal to sell large-tow carbon fiber to SP for the same price as offered by a third party seller. If Zoltek offered to match the price offered by another supplier, then SP was obligated to purchase from Zoltek. We think the Missouri courts are likely to agree with the observation in a leading treatise that this mechanism does not render the contract illusory:

> The seller may not promise to meet such prices, but the seller may be given the option of doing so. If the seller meets such prices, the buyer must buy of the seller or not at all. If the seller does not meet such prices, the buyer has the privilege of buying elsewhere. Such promises are not illusory and the contract is valid.

Arthur Linton Corbin, et al., 2-6 *Corbin on Contracts* § 6.8.

Zoltek's authorities do not persuade us to the contrary. They demonstrate only that if SP had an *unfettered* option to purchase from another supplier during the term of the contract, then this option would destroy the exclusivity of the arrangement, and demonstrate lack of consideration. *E.g.*, *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, 1108 (7th Cir. 1999); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 459 (9th Cir. 1978); *Loizeaux Builders Supply Co. v. Donald B. Ludwig Co.*, 366 A.2d 721, 724 (N.J. Super. Ct. Law Div. 1976); *Propane Indus., Inc. v. General Motors Corp.*, 429 F. Supp. 214, 221 (W.D. Mo. 1977). The inclusion in the Supply Agreement of a right of first refusal for Zoltek to retain its exclusive right to supply SP, so long as it matched a market price offered by another supplier, is sufficient to create mutuality of obligation and consideration.

Third, we do not agree with Zoltek that if small-tow and large-tow fiber are "interchangeable," then the Supply Agreement lacked mutuality. There was a good deal of evidence at trial that small-tow and large-tow fiber are distinct products, with different qualities and applications. But assuming for the sake of argument that a jury could find that small-tow and large-tow fibers are in fact "interchangeable," as Zoltek contends, the authorities cited by Zoltek do not establish that the Supply Agreement is void for lack of mutuality. These cases illustrate, rather, that when a buyer contracts to purchase its requirements for a product from a particular seller, but then – without a "good faith" basis to do so – purchases an interchangeable product from a third party instead, the buyer may have *breached* the requirements contract. *E.g.*, *Fike Corp. v. Great Lakes Chemical Corp.*, 332 F.3d 520, 524 (8th Cir. 2003); *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1339-41 (7th Cir. 1988); *Loudenback Fertilizer Co. v. Tenn. Phosphate Co.*, 121 F. 298, 303 (6th Cir. 1903). Zoltek was free to argue on this basis that SP's purchase of small-tow fiber from parties other than Zoltek was a breach of the agreement to purchase large-tow fiber exclusively from Zoltek, but the jury found that SP performed its obligations under the contract. SP's obligation to purchase in good faith all of its requirements for

large-tow fiber exclusively from Zoltek was sufficient consideration to make the contract valid.

For these reasons, we agree with the district court's alternative holding that "on the face of the agreement, there is mutuality of obligation and, therefore, consideration." Therefore, any error in characterizing lack of consideration as an affirmative defense or in denying Zoltek's motion to amend its complaint did not prejudice Zoltek.

B.

Zoltek next contends that the district court erred by refusing to instruct the jury on Zoltek's theory that SP had abandoned the Supply Agreement. Zoltek asked the court to give an instruction that the jury's verdict must be for Zoltek if "the parties, by their conduct, treated the 2000 Supply Agreement as if it were no longer in effect, and thereby abandoned the 2000 Supply Agreement." (Zoltek App. 425-26). The district court refused the proposed instruction, and later stood by its decision in post-trial orders. In denying Zoltek's motion for judgment as a matter of law, the court explained that Zoltek "argued in its trial brief that *plaintiffs* abandoned the agreement," that Zoltek argued "for the first time" in its post-trial motion that "the parties *mutually* abandoned the 2000 Supply Agreement." The court ruled that it would "not address an argument raised for the first time in a post-trial motion." (R. Doc. 431, at 4).[4]

Under Missouri law, whether abandonment is an issue for the court or the jury depends on the nature of the argument advanced by the party claiming abandonment.

[4]In its order denying Zoltek's motion for a new trial, the district court reaffirmed its ruling that Zoltek "had not made a submissible case that the parties *mutually* abandoned the Supply Agreement," (R. Doc. 430, at 13), presumably because it believed that Zoltek had argued only that SP had abandoned the agreement.

"When an abandonment by one party to a contract is predicated of certain specific acts, or one given act, it is proper for the court to declare whether such act or acts constitute an abandonment." *Chouteau v. Jupiter Iron Works*, 83 Mo. 73, 82 (1884) (*Chouteau I*). Thus, it was error for the trial court in *Henry v. Bassett*, 75 Mo. 89 (1881), to submit to a jury the question whether a contract was abandoned or not, *id.* at 95, where "no mutual agreement of abandonment was alleged," but it was "charged that the plaintiff, Henry, had abandoned the contract" by taking certain specific acts. *Chouteau I*, 83 Mo. at 82. In that circumstance, the trial court should have declared whether the specified acts of the plaintiff were sufficient to constitute an abandonment. *Henry*, 75 Mo. at 95.

By contrast, "where a mutual agreement to abandon is relied upon, it may be proved by an express agreement to that effect, or by circumstances which warrant the inference, that the parties mutually agreed to abandon it." *Chouteau I*, 83 Mo. at 82. If certain acts by one party are insufficient by themselves to constitute abandonment, then the jury should be so instructed, and the failure to do so is reversible error, *id.* at 83-84, but the question of mutual abandonment should be submitted to a jury, if the evidence on the whole is sufficient to support a finding of abandonment. *Chouteau v. Jupiter Iron-Works*, 7 S.W. 467, 470 (Mo. 1887) (*Chouteau II*); *see Bacon v. Boss*, 290 S.W.2d 207, 210 (Mo. 1956) (citing *Chouteau II*). To be proved under Missouri law, a mutual abandonment "must be demonstrated by positive and unequivocal acts and conduct which are inconsistent with a mutual intention to be further bound by the contract." *Waddington v. Wick*, 652 S.W.2d 147, 150 (Mo. Ct. App. 1983); *see O'Brien & Gere Technical Serv., Inc. v. Fru-Con/Fluor Daniel Joint Venture*, 380 F.3d 447, 455 (8th Cir. 2004) (Missouri law).

In the district court, Zoltek argued that SP abandoned the Supply Agreement when it purchased no carbon fiber from Zoltek between February 2002 and early 2004. We agree with the district court that the absence of orders by SP, even over a period of more than two years, is insufficient to demonstrate a mutual abandonment

-10-

of the Supply Agreement. A buyer under a requirements contract may, consistent with the contract, reduce its requirements even to zero, as long as the buyer is acting in good faith. *See* U.C.C. § 2-306 cmt. 2 (2004) ("Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance."). That a buyer does so, therefore, is not a positive and unequivocal act demonstrating abandonment, and the district court was correct to conclude that SP's acts did not constitute an abandonment. The jury, moreover, found that SP performed its obligations under the Supply Agreement, thus rejecting any suggestion that SP's failure to order carbon fiber in 2003 and 2004 was a *breach* of the contract, much less an abandonment.

On appeal, Zoltek contends that a "Supply/Purchase Agreement" for Panex 35, signed by the parties in April 2004, superseded the 2000 Supply Agreement and demonstrated a mutual intent of the parties to abandon the 2000 contract. This argument, however, was not presented in the district court, and we therefore decline to consider it. Prior to the jury's verdict, Zoltek never cited the 2004 contract as evidence of mutual abandonment. Zoltek argued instead that the 2004 agreement for Panex 35 showed that the 2000 Supply Agreement did not include Panex 35. (T. Tr. 2300-02). The district court, therefore, correctly observed that Zoltek advanced a contention of mutual abandonment for the first time in its post-trial motions. The court properly declined to instruct the jury on abandonment based on the arguments then presented, and Zoltek's subsequent reliance on the 2004 contract comes too late to support a conclusion that the district court's instructions were erroneous.

C.

Zoltek next contends that the district court admitted irrelevant and unfairly prejudicial evidence at trial. We review the district court's evidentiary decisions for abuse of discretion. *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1059 (8th Cir. 1995).

Zoltek focuses on SP's use of a statement made by Zoltek's attorney, Alan Kohn, at a preliminary injunction hearing. In opposing SP's motion for an injunction that would have required Zoltek to provide SP with Panex 35, Kohn stated: "[T]hey have no contract for Panex 35. All they have is some old Panex 33 contract which [Zoltek] is ready, willing and able to perform." (Zoltek App. 694). In later proceedings, SP quoted Kohn's statement, over Zoltek's repeated objections, and argued that it was an admission by Zoltek that the Supply Agreement entitled SP at least to a supply of Panex 33. Zoltek contends that the Kohn statement was taken out of context and used to mislead the jury.

The district court allowed SP to quote the Kohn statement, but also gave Zoltek an opportunity to present evidence to place the statement in what Zoltek argued was the proper context. Zoltek's CEO testified that the quotation from Kohn was a "mischaracterization of what he said," and that "[i]n balance," what Kohn said was "reasonable." He testified that Kohn meant that "there was a failed or an old contract which [Zoltek] would be ready, willing, and able to perform against *if it [had not been] breached by multiple breaches*," but that Kohn's "unfortunate single statement by itself [ ] is not representative of what should have [been] said." (T. Tr. 1941) (emphasis added).

A statement by a party's attorney can be admissible as an admission by a party opponent if it is relevant. *Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 403 (8th Cir. 1989). Given the context in which Kohn made his statement, the district court concluded that Kohn's statement was relevant as an admission that Zoltek was willing to perform under the 2000 Supply Agreement by producing Panex 33 to SP:

> There was no misinterpretation. I understood exactly what he said to me at that hearing. . . . So you can characterize it any number of ways that you want to. But when I left that hearing, I thought that Panex 33 was going to be supplied to the plaintiffs but not 35, as they had asked for now, that was my impression; and I think it was a reasonable impression

-12-

and a reasonable conclusion to draw, based on what was said during that hearing.

(T. Tr. 59-60).

The court's conclusion that Kohn's statement was relevant on this basis was not an abuse of discretion. Although the specific issue presented in the preliminary injunction hearing was whether Zoltek was required to provide Panex 35, Kohn relied on Zoltek's asserted willingness to provide Panex 33 in an effort to persuade the court to deny the motion. Having made the statement in an effort to gain advantage in the litigation, we do not think Zoltek can establish that the district court abused its discretion by permitting SP to invoke counsel's statement as a potential admission. The district court adequately guarded against any unfair prejudice by permitting Zoltek's CEO to place Kohn's statement in what Zoltek believed to be the proper context, and to offer a mitigating explanation for Kohn's comment.

Kohn's argument is different from the attorney statement that was held to be irrelevant and inadmissible in *Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835, 843 (D.C. Cir. 1981). In that case, the purported "admission" was made in the context of litigation involving a defendant's third-party complaint for indemnity and contribution. The disputed statement by counsel was prefaced with a caveat that the allegations at issue were "assumed to be true" for purposes of a motion to dismiss the third-party complaint. The court in *Schneider* held that third-party pleadings were excepted from "the general rule of admissibility," because "[t]he goals of efficient federal procedure would be frustrated if hypothetical pleadings from third-party proceedings could be introduced into evidence." *Id.* at 843. The court reasoned that the "purely contingent statements" concerning the third-party complaint were irrelevant to the issues in the underlying lawsuit. The statement by Zoltek's counsel, of course, was not made in the context of a third-party pleading, and it was not the sort of hypothetical assumption involved in a defendant's third-party complaint for

contribution and indemnity. We therefore conclude that *Schneider* is distinguishable, and that the district court's ruling was not reversible error.[5]

D.

1.

Zoltek argues that the jury's damages award to SP was based on impermissible speculation and other improper grounds. Zoltek contends that SP's damages calculations were based only on summaries of lost sales provided by SP management, conversations with SP management, and projected sales from SP budgets, and that none of these sources were sufficiently reliable to support the jury's verdict.

---

[5]Zoltek argues that the alleged error in admitting Kohn's statement was "compounded" by a statement of Paul Lyon, SP's Group Purchasing Manager, that "[t]here was a judgment from this court, I believe that said Zoltek had to supply Panex 33." Zoltek says that Lyon mischaracterized the result of the preliminary injunction hearing. The district court sustained Zoltek's objection to Lyon's testimony, and instructed the jury to disregard the statement. Zoltek asked the district court also to give a curative instruction "at the time the instructions are read to the jury that the Court made no merits determination on either Panex 33 or Panex 35 at the time of the injunction hearing." Zoltek argues on appeal that "the District Court flatly refused to give any curative instruction, and simply told the jury to disregard the statement."

The district court, however, did instruct the jury before deliberations that "[a]ny testimony that I struck from the record or told you to disregard is not evidence and must not be considered." This instruction, together with the court's action at the time of the objection, was sufficient to cure any prejudice that might have been caused by the testimony. *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 353 (8th Cir. 2002); *Lockley v. Deere & Co.*, 933 F.2d 1378, 1389 (8th Cir. 1991). To the extent Zoltek asserts that the district court erred by failing to give the jury a more specific instruction before deliberations, we conclude that there was no abuse of discretion.

-14-

We apply state law to evaluate whether a jury's damage award is adequately supported by the record. *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 918 (8th Cir. 2004) (Missouri law). Under Missouri law, "[l]ost profits related to a breach preventing performance are recoverable provided the loss is the natural and proximate result of the breach, is ascertainable with reasonable certainty, is not speculative or conjectural, and was within the contemplation of the parties when the contract was made." *Farmer's Electric Co-op., Inc. v. Missouri Dep't of Corrections*, 59 S.W.3d 520, 522 (Mo. 2001).

Under Federal Rule of Evidence 703, "an expert may rely on otherwise inadmissible hearsay in forming [her] opinion if the facts and data upon which [she] relies are of a type reasonably relied upon by experts in the field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997). The expert's opinion should be excluded only if it is "so fundamentally unsupported that it cannot help the factfinder." *South Cent. Petroleum, Inc. v. Long Bros. Oil Co.*, 974 F.2d 1015, 1019 (8th Cir. 1992) (internal quotation omitted). As a rule, questions regarding the factual underpinnings of the expert's opinion affect the weight and credibility of her testimony, not its admissibility. *Id.* We have said that "[o]nce expert testimony has been admitted, the rules of evidence then place the full burden of exploration of facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." *Brennan v. Reinhart Inst'l Foods*, 211 F.3d 449, 451 (8th Cir. 2000) (internal quotation omitted).

We conclude that the jury's award in this case was adequately supported by the record. SP's damages expert, Donna Smith, calculated SP's lost profits based primarily on a document created by SP's then-Managing Director called "Summary of Vestas and Gamesa Lost Sales," budget figures kept in the ordinary course of business by SP, conversations with SP management, deposition testimony of Zoltek personnel, and Zoltek's annual reports and investor presentations. Smith testified that the method and sources she used to calculate SP's lost profits was "generally accepted

by experts in this field." Zoltek had an opportunity to challenge Smith's assertion that her sources were consistent with professionally accepted standards, and to dispute the reliability of the underlying factual information on which she relied. The sources were not so slight as to be "fundamentally unsupported," and the weight to be given Smith's opinion was properly left to the jury.

The district court reasoned that Smith compared the sales projections provided by SP's Managing Director with actual purchases, and found that the amounts were substantially equal. Relying in part on Zoltek's own projection that demand for fiber was expected to exceed supply for years to come, Smith testified that SP could have processed and sold all of the Panex 35 to which it was entitled to under the Supply Agreement. SP presented evidence that it could have sold 3,960,276 additional pounds of Panex 35 between 2005 and 2006 due to a market-wide shortage of carbon fiber. Zoltek's CEO himself agreed that given the state of the market, Zoltek would be able to sell whatever carbon fiber it was able to make for the foreseeable future. (Zoltek App. at 1075-76).

Smith's report verified that SP possessed adequate manufacturing capacity to process 3,960,276 additional pounds of Panex 35 between 2005 and 2006, and subtracted variable costs not incurred as a result of Zoltek's alleged breach. To arrive at the $21,138,518 award, Smith multiplied the volume of Panex 35 to which SP was entitled to under the Supply Agreement by the then-current market price. This figure was then multiplied by SP's most recent eighteen month profit margin of 35 percent, which was confirmed before trial by actual performance from January 2005 through June 2006. Based on this evidence, we conclude that the jury's award was adequately supported by the record.

2.

Zoltek argues that the district court erred by allowing SP to present to the jury a damages calculation that did not count $13,353,696 worth of Panex 35 toward the maximum volume SP was allegedly entitled to under the Supply Agreement. This amount reflected a quantity of Panex 35 purchased from Zoltek in 2006 and provided to a wind energy manufacturer, Gamesa, under a sales contract between Zoltek and Gamesa. The contract allowed Gamesa to specify a prepreg processor, and Gamesa chose SP. Because SP received fiber from Zoltek in connection with the Gamesa contract, Zoltek argues that the shipment under this contract should have been subtracted from the maximum volume of Panex to which SP was entitled under the Supply Agreement. SP counters that the shipment was processed pursuant to Gamesa's separate contractual right, not SP's contractual right under the Supply Agreement, and therefore should be excluded from the volume allowed under the Supply Agreement. Zoltek also argues that it was prejudiced when the district court allowed SP's to change its proposed damages calculation twenty-two days before trial by removing an offset for the amount of the Gamesa contract.

The district court allowed SP to submit alternative damages figures, one that counted the $13,353,696 Gamesa shipment toward the maximum quantity allowed under the Supply Agreement, and one that did not. The jury adopted the larger figure. Zoltek moved to reduce the award by $13,353,696 as a matter of law, but the district court ruled that the sale to Gamesa had "no bearing on [Zoltek's] obligation to provide carbon fiber to [SP] under the Supply Agreement."

We first conclude that the district court did not abuse its discretion in rejecting Zoltek's objection to the timeliness of SP's alternative damages calculation. In *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342 (8th Cir. 1979), this court held that a district court did not abuse its discretion by allowing a change in the formula used to calculate damages four days before trial, because "the documents upon which

-17-

[the plaintiff's] damages were calculated were made available to [the defendant] well in advance of trial," and because the defendant failed to seek a continuance after being notified of the change in the formula. *Id*. at 344. Similarly here, we see no prejudice to Zoltek and no abuse of discretion. The Gamesa contract was incorporated into Smith's first report on damages; in that version, the amount was deducted from the lost profits to which SP claimed that it was entitled. The revised report merely changed that assumption and projected the lost profits without applying an offset for Gamesa. The underlying information was available to Zoltek throughout, and Zoltek had adequate opportunity to argue why it believed that the amount of the Gamesa contract should offset any damages that the jury awarded under the requirements contract.

We also are not persuaded that the amount of the Gamesa contract must be excluded as a matter of law from the jury's final award to SP. The jury determined that the volume of carbon fiber sold to Gamesa and processed by SP was not sold pursuant to a right created under the Supply Agreement. The jury's verdict in this respect was adequately supported by the record. There was evidence that SP was not a party to the Gamesa contract, was not involved in negotiating the contract, had no say over the price or quantity shipped, and was obligated to transfer the product to Gamesa after processing it. Zoltek's CEO similarly testified at one point that the shipment was made pursuant to Gamesa's contractual right and "not to fulfill any contractual commitment to SP." The evidence adequately supported the jury's decision to find that Zoltek's breach of the requirements contract extended to the full amount to which SP was entitled under that contract, without regard to the separate Gamesa contract.

3.

Finally, Zoltek argues that the district court's damages instruction to the jury did not "fairly and adequately present the applicable Missouri law of lost profits."

-18-

The district court instructed the jury that if it found in favor of SP on its claim for breach of the supply agreement, then it must award the plaintiffs such sums as "you believe will fairly and justly compensate them for any damages you believed they sustained (and are reasonably certain to sustain in the future) as a direct result of Zoltek's breach of the Supply Agreement." Zoltek complains that the instruction should have included a specific direction not to award speculative damages, and that the requirement of "reasonable certainty" should have applied to damages already sustained, as well as damages to be sustained in the future.

We review a district court's jury instructions for an abuse of discretion. *Black v. Shultz*, 530 F.3d 702, 708 (8th Cir. 2008). To instruct the jury on damages, the district court used Instruction No. 4.01 of the Missouri Approved Instructions (MAI) for civil cases, which the Supreme Court of Missouri has described as "a short, simple, general instruction which directs an award which will fairly compensate plaintiffs for their damages." *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo. 1970). We have rejected another challenge to the verbatim use of MAI 4.01, holding that "[w]here the charge to the jury correctly sets forth the law, a lack of perfect clarity will not render the charge erroneous." *Roth v. Black & Decker, U.S., Inc.*, 737 F.2d 779, 783-84 (8th Cir. 1984). We are not persuaded that the damages instruction in this case was flawed. Given the specific direction that *future* damages must be "reasonably certain," we see no reasonable likelihood that a jury would have understood that *present* damages for loss profits could be established by some lesser degree of certainty or by speculation. We are satisfied that the instruction accurately sets forth Missouri law and was sufficiently clear to give the jury appropriate direction.

III.

In its cross-appeal, SP argues that the district court erred by granting Zoltek's motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e). The verdict form submitted to the jury included alternative damages calculations

-19-

corresponding to 3,000,000 pounds of Panex 33 and 3,960,276 pounds of Panex 35. The jury awarded SP damages under both calculations. The district court concluded that SP had argued throughout the case that the Supply Agreement entitled them to "either Panex 33 or Panex 35," but not to both, and therefore vacated the lesser of the two awards as duplicative.

We conclude that the district court did not abuse its discretion. SP's complaint pleaded Counts I and II in the alternative, demanding that Zoltek "supply the unfulfilled quantities of PANEX 35 or, in the alternative, PANEX 33," and alleging that the contract was modified to "substitute" Panex 35 for Panex 33. SP's damages expert presented "alternative" damages calculations – one that assumed the Supply Agreement encompassed both Panex 33 and Panex 35, and a second that assumed that only Panex 33 was covered. The Supply Agreement referred to Panex 33 only, and established a maximum quantity that SP was entitled to order. The jury evidently accepted SP's contention that it also was entitled to order Panex 35 under the agreement, because it was an improved version of Panex 33, but the agreement did not provide that SP could order the maximum quantity of *both* Panex 33 and Panex 35.

Under the Supply Agreement, SP was entitled to order the quantity of carbon fiber ordered in the immediately preceding year, plus one million pounds. Thus, between 2004 and 2005, SP was entitled either to 3,960,276 pounds of Panex 35, or 3,000,000 pounds of Panex 33, but not both. The jury's award under both Count I and Count II gave SP profit corresponding to 6,960,276 pounds of large-tow carbon fiber when at most SP was entitled to 3,960,276 pounds. Therefore, the district court acted

within its discretion when it determined that the jury's award under both counts was duplicative and altered the judgment accordingly.

*    *    *

For these reasons, the judgment of the district court is affirmed.

_____