# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3066
_____

Estate of Nell G. Pepper, by the administrator for both Estates, Norma Deeble;
Estate of Sterling Gary Pepper, by the administrator for both Estates, Norma Deeble

*Plaintiffs - Appellants*

v.

Nancy Pease Whitehead; Pease Family Partnership

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 10, 2014
Filed: March 9, 2015

_____

Before WOLLMAN, COLLOTON, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Before us once again is the controversy regarding the ownership of the collection of Elvis Presley memorabilia amassed by the late Sterling Gary Pepper, Jr.

In Estate of Pepper v. Whitehead, 686 F.3d 658 (8th Cir. 2012), we set forth at length the factual and procedural background of this litigation, reversed the district

court's grant of summary judgment, and remanded the case for further proceedings. What follows here is a summary of the factual and procedural history set forth in our earlier opinion and an account of the evidence presented at the trial that was held on remand.

_____

Sterling Gary Pepper, Jr. (Gary) owned an extensive collection of Elvis Presley (Elvis) memorabilia. When he moved into a nursing home in 1978, he told Nancy Pease Whitehead (Nancy) to "keep it." Gary died two years later. Nancy and her sister maintained the collection until 2009, when the Pease Family Partnership (the Partnership) put it up for auction, at which it sold on October 19, 2009, for more than $250,000.

The Estate of Nell G. Pepper and the Estate of Sterling Gary Pepper (the Estates) filed suit, alleging that Gary retained ownership of the collection and that his ownership interest passed to his heirs upon his death. Following a four-day trial, a jury found that Gary had made a conditional gift to Nancy. Accordingly, when Gary died, Nancy's ownership interest was no longer subject to Gary's reversionary interest, thus entitling the Partnership to the proceeds of the auction. The Estates appeal, arguing that the evidence did not establish a conditional gift and that the district court[1] should have granted their motion for judgment as a matter of law or, alternatively, their motion for a new trial. We affirm.

I.

We state the facts in the light most favorable to the verdict. <u>Structural Polymer Grp., Ltd. v. Zoltek Corp.</u>, 543 F.3d 987, 991 (8th Cir. 2008) (standard of review).

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Gary was born on May 5, 1931. He lived in a modest two-bedroom bungalow with his parents in Memphis, Tennessee. Gary suffered from cerebral palsy and needed assistance with everyday tasks, including eating and walking. His mother, Nell Lucas Pepper (Nell), cared for Gary during his younger years. By all accounts, Gary was an ambitious person. He started a newspaper-clipping service when he was a teenager and later served as president of an Elvis fan club and as a correspondent to other Elvis fan clubs.

Through his clipping service, Gary met Elvis, and the two became friends. During an October 1960 interview, Elvis said, "When I'm back in Memphis, Gary is with me almost every night. We go out and see the town and have a big old time. He was the first one to greet me at the train when I got back from the Army." A photograph accompanying the article shows Elvis, who was dressed in costume for his movie <u>Flaming Star</u>, standing next to Gary, who was seated in a wheelchair and grinning broadly. Gary also attended Elvis and Priscilla Presley's wedding reception and later greeted the couple's newborn daughter at Graceland. Along with paying Gary a salary for his work with the fans, Elvis often gave him gifts. Over time, Gary amassed a large collection of Elvis memorabilia.

Gary's father died in 1971. Nell suffered from depression and gradually became unable to care for Gary. Elvis asked Carl Nichols (Carl) to look after Gary and Nell's well-being. During the summer of 1975, Carl approached Nancy, who was then a young nurse, and asked whether she would care for Gary and Nell. Nancy, a devoted fan of Elvis, had moved to Memphis from Cedar Rapids, Iowa, in 1974 and spent evenings at Graceland's front gate. When Carl brought her to the Peppers' home, Nancy went to work immediately and eventually moved in with Gary and Nell. After Nancy's mother moved from Iowa to Memphis to help care for the Peppers, the four moved into a larger house that was closer to Graceland and to Elvis's father's home. Nancy testified, "Our back fence abutted the fence of Graceland, so we could look over the fence and see Elvis's horses and his backyard." Nancy and her mother were

not compensated for their services. Nancy's mother, Gary, and Nell received social security income, which was supplemented by the salary Elvis paid Gary.

Gary described Nancy as his "nurse, housekeeper, cook, assistant, friend and secretary." Nancy dressed, bathed, and fed Gary. She helped him complete physical therapy, attended his doctor's appointments, and was able to wean him off certain medications. She also cleaned and cooked meals for Gary and Nell. Nancy and Gary spent their free time together, too, attending church three times a week and traveling to places like Tupelo, Mississippi; Las Vegas, Nevada; and Long Beach, California.

Above all, Nancy and Gary shared a love of Elvis. They made daily "pilgrimages," as Nancy called them, to Graceland. They attended Elvis concerts together. Nancy helped Gary with his columns for fan-club newsletters. In an undated note, Gary wrote, "Dearest Nancy, Thanks so much for what you [have] done for me and my dear mom this past year. I won't be able to repay you in a million years. Please know I appreciate it. May God always keep you forever . . . I will always love you."

Elvis died on August 16, 1977. Nancy and Gary attended the funeral, and Elvis's father gave them two white roses from the casket. Nancy testified that Memphis "changed within a few days" and that "[i]t was like a different world." Although she wanted to leave Memphis after Elvis's death, she "never wanted to lose Gary and Nell."

Times were hard after Elvis died. Gary underwent a surgery that had shown promise of lessening the symptoms of cerebral palsy. Although Nancy described the surgery as "very much a success," it took a toll on her relationship with Gary. Then, Elvis's estate ended payments to Gary. Nancy and her mother decided to return to Iowa, and they invited Gary and Nell to join them. In April 1978, after Gary had

recovered, the four moved together to Cedar Rapids, bringing with them Gary's collection of Elvis memorabilia.

The Peppers lived with Nancy and her family until the summer of 1978, when Gary and Nell entered a Cedar Rapids nursing home. Nancy visited Gary and Nell at the nursing home daily and fed Gary every evening. At Gary's request, Nancy brought certain items of Elvis memorabilia to the nursing home. The remainder of the collection stayed at Nancy's family's home. Gary told Nancy to "keep it."

In the fall of 1978, Gary's relatives from California moved Gary and Nell from the Cedar Rapids nursing home to Long Beach, California. Gary took with him the memorabilia that Nancy had brought to the nursing home, which consisted of a 14-karat gold bracelet given to Gary by Elvis inscribed "From E.P. 12/25/65"; two gold rings; a Rolex Oyster watch given to Gary by Elvis; autographed record covers; Sun Studios records; a home video of Priscilla Presley's baby shower; a "G.I. Blues" album cover autographed by Elvis and his manager, "The Colonel"; photographs of Elvis, Gary, and Nell; and a letter and envelope from Elvis to Gary sent from Germany.

Nancy did not learn of the move until she stopped by the nursing home to feed Gary, only to discover that he and Nell were gone. Gary and Nell remained in California until their respective deaths on March 29, 1980, and December 29, 1982. Gary and Nell did not contact Nancy after they moved, and Nancy made no attempt to contact them.

Nancy kept the collection of Elvis memorabilia until 1982 or 1983, when she gave it to her sister, Janet "Jenny" Jorgensen (Jenny), who then maintained the collection until 2009, when she decided to sell it. Jenny created the Partnership—an Iowa general partnership composed of Nancy, Jenny, and their brother—to which Jenny transferred the collection. The Partnership then transferred the collection to an

auction house in Chicago, Illinois, where it was entitled the "Gary Pepper Collection of Elvis Presley Memorabilia" (the Collection) and, as set forth above, sold at auction.

The auction catalogue showed the items that Nancy and her sister had maintained for more than thirty years. The auction resulted in a total sale price of $250,465.00, including $28,000 for a red ultrasuede shirt worn by Elvis; $15,000 for a large quantity of Elvis's hair that was cut for his Army tour of duty; $6,000 for an original 1954 record of Elvis's first single, "That's All Right"; $4,000 for original photographs and negatives from Elvis and Priscilla's wedding reception; $600 for a set of Elvis's concert-used handkerchiefs; and $1,400 for the two dried white roses from Elvis's funeral. The auction house deducted $25,046.50 for fees and $7,500 for legal expenses.

As recounted in our earlier opinion, this lawsuit was filed on October 15, 2009, and the proceeds from the auction were ordered to be maintained in escrow pending resolution of the case. The Estates alleged claims for conversion, fraud, mislaid or lost property, and failure of bailee to return property. In their answer, Nancy and the Partnership responded that Gary had "made a gift conditional of personal property in which he retained a reversionary interest." That gift, according to Nancy and the Partnership, became irrevocable upon his death.

Before the case was submitted to the jury, the Estates moved for judgment as a matter of law, which was denied. The district court instructed the jury that to find a conditional gift:

> [Nancy and the Partnership] must prove by clear, convincing, and satisfactory evidence that Gary delivered his Collection to Nancy with the intention that Nancy acquire an ownership interest in his Collection that terminated Gary's interest after the passage of some specified period of time or on the occurrence or nonoccurrence of some event or condition and that Nancy accepted Gary's Collection.

Jury Instruction 13. The jury returned a verdict in favor of Nancy and the Partnership. The district court denied the Estates' renewed motion for judgment as a matter of law and their motion for a new trial.[2]

## II.

At issue in this appeal is whether sufficient evidence supported the jury's finding that Gary had given the Collection to Nancy as a conditional gift. We review *de novo* the district court's denial of the Estates' motion for judgment as a matter of law. See Structural Polymer Grp., 543 F.3d at 991. We view the evidence in the light most favorable to the verdict and affirm unless no reasonable juror could have reached the same conclusion. Id. We review the denial of the Estates' motion for a new trial for abuse of discretion. Id. "A new trial motion premised on a dispute about the strength of the supporting proof should be granted only 'if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice.'" Id. (quoting The Shaw Grp., Inc. v. Marcum, 516 F.3d 1061, 1067 (8th Cir. 2008)). The parties agree that Iowa law applies in this diversity case.

A gift is property "which is voluntarily transferred by one person to another without compensation." Kirchner v. Lenz, 87 N.W. 497, 498 (Iowa 1901) (citation omitted). To show that the transfer of property was a gift, the donee must establish donative intent, delivery, and acceptance. Gray v. Roth, 438 N.W.2d 25, 29 (Iowa Ct. App. 1989); see also Runnels v. Anderson, 173 N.W. 91, 94 (Iowa 1919). The intent of the donor is the controlling element. Gray, 438 N.W.2d at 29.

---

[2]The parties agree that Jury Instruction 13 was based on section 31.2 of the Restatement (Second) of Property: Donative Transfers (1992), Gift of Personal Property in Which the Donor Retains Reversionary Interest. The Estates do not argue that the jury instruction was erroneous or that the district court erred by applying section 31.2 in ruling on the post-trial motions.

To give a conditional gift, the donor must "deliver[] the personal property to the donee . . . with the manifested intention that the donee acquire an ownership that terminates—(1) after the passage of some specified period of time; or (2) on the occurrence or nonoccurrence of some event or condition." Restatement (Second) of Prop.: Donative Transfers § 31.2 (1992). The donor of a conditional gift thus gives less than his entire ownership interest in the property and retains for himself a reversionary interest. Id. § 31.2 cmt. a. In the case of a gift that may be terminated at any time by the donor, "the donor's right to terminate automatically expires at the death of the donor." Id. § 31.2 cmt. b. This concept is explained by the following illustration:

> O is the owner of a watch. O delivers the watch to his son, S, with the comment, "You may use this watch until I want it back." Legally admissible evidence is available to prove that O made the quoted comment. S is entitled to wear the watch until O requests its return. If O dies without requesting the return of the watch, the conclusion is justified that S is entitled to keep the watch.

Id. § 31.2 cmt. b. illus. 1.

The Estates argue that there was insufficient evidence to allow the jury to find (1) that Gary delivered the Collection to Nancy with the intention that she acquire an ownership interest and (2) that Gary placed any conditions on the gift. They contend that Nancy's testimony is consistent only with a bailment relationship, in which Gary intended to retain ownership of the Collection and delivered the Collection to Nancy only for safekeeping. We disagree with the Estates' characterization of the evidence.

Nancy testified at trial that Gary did not give her specific instructions about the Collection: "Gary never said anything except keep it." According to Nancy, the Collection "always has been Gary's and it always will be Gary's." She said that if Gary had asked her to return it to him, she would have done so. Similarly, if Gary's

-8-

family had asked for the Collection before she gave it to her sister, she would have given it to them.

> Q:  You didn't believe that you owned any of those items, is that correct?
>
> A:  As long as Gary was alive, I was keeping it for him.
>
> Q:  And you never understood the collection as a gift to you, is that correct?
>
> A:  No.

When asked whether she owned the property, Nancy replied, "I believe I owned the responsibility for the collection after he passed away."

Nancy's subjective belief whether she owned the Collection does not establish whether Gary manifested the intention that she acquire an ownership interest. Stated differently, Nancy's testimony is not conclusive as to Gary's intent. That she always would consider the Collection to be Gary's is a statement born of sentiment. That she would have returned it to the family shortly after Gary's death did not impose upon her an enforceable obligation to do so. Similarly, although her testimony could mean that she did not understand delivery of the Collection to be a gift, it does not establish that Gary intended to create only a bailment relationship. And whatever Nancy meant by "own[ing] the responsibility for the collection" is not for this court to decide.

Gary told Nancy to "keep it," a phrase that can have different meanings, depending on the circumstances in which it is used. Whether Gary intended to effectuate a conditional gift—*i.e.*, "keep it unless I ask for it back"—or whether he intended to create a bailment relationship—*i.e.*, "keep it safe for me"—was a question for the jury. There is no direct evidence that Gary intended for Nancy to keep the Collection until he wanted it back; similarly, there is no direct evidence that Gary

intended for Nancy merely to hold it for safekeeping. He simply said, "Keep it." A reasonable jury could infer either a conditional gift or a bailment, and despite the Estates' argument to the contrary, a reasonable jury could find that Gary implied a condition that the Collection be returned upon his request.

The evidence of Gary and Nancy's relationship also supports the jury's finding of a conditional gift. Gary and Nancy shared a passion for Elvis, and Gary considered Nancy to be his nurse and his friend. The jurors heard testimony about the care Nancy had provided, read notes that Gary had written to Nancy, and saw photographs of the two spending time together. Nancy explained how important the Collection was to Gary and how he asked Nancy to bring certain cherished items to him at the nursing home. Gary left the remainder of the Collection in Nancy's care and never asked her to return it. Gary's relatives, who lived in California and were not Elvis fans, testified that Gary did not even tell them about the Collection. During trial, Nancy explained that "[Gary] made it quite clear to me that he did not want his relatives in California to be entrusted with [the Collection]." Given this evidence, a reasonable jury could find that Gary wanted the Collection to be owned and maintained by a friend who shared his love of Elvis, who had taken care of him and his mother for years, who recognized the significance of the Collection, and who would keep the Collection unless and until he asked her to return it.

III.

The judgment is affirmed.

_____